IN THE UNITED STATES DISTRICT COURT
                 SOUTHERN DISTRICT OF FLORIDA
                        CIVIL DIVISION
                 CASE NO. 0:14-CV-60269-RNS


MOISES ORE, et al.,

                    Plaintiffs.

        vs.

TRICAM INDUSTRIES, INC., a foreign
corporation and HOME DEPOT USA, INC.,
a foreign corporation,

                    Defendants.
_____/


                 VIDEOTAPED DEPOSITION

                          OF

                PAUL L.GINSBERG, M.D.

            TAKEN ON BEHALF OF THE PLAINTIFF

             Wednesday, March 22, 2017
              10:23 a.m. - 12:19 p.m.




                 Sunrise Medical Group
                  12596 Pines boulevard
               Pembroke Pines, Florida 33027
                    Job #J0513678






            Reported by:  Dona J. Wong, CSR, RPR




```
 1   APPEARANCES OF COUNSEL

 2
         On behalf of the Plaintiff:
 3

 4               COFFEY TRIAL LAW
                 500 Northeast Fourth Street
 5               Suite 100
                 Fort Lauderdale, Florida  33301
 6               Telephone:  (954) 541-3194
                 Fax:  (954) 780-8668
 7               E-mail:  Sam@coffeytriallaw.com
                 By:  SAMUEL A. COFFEY, ATTORNEY AT LAW
 8

 9
         On behalf of the Defendants:
10

11               LEWIS, BRISBOIS, BISGAARD & SMITH, LLP
                 110 Southeast 6th Street
12               Suite 2600
                 Fort Lauderdale, Florida  33301
13               Telephone:  (954) 728-1280
                 Fax:  (954) 728-1282
14               E-mail:  Jmowers@lbbslaw.com
                 By:  JEFFREY A. MOWERS, ATTORNEY AT LAW
15

16   Also Present:

17               BOBBY DOYLE, VIDEOGRAPHER

18                        -   -   -

19

20

21

22

23

24

25
```



PAUL L. GINSBERG, M.D.                                    March 22, 2017
ORE vs TRICAM INDUSTRIES                                              3

```
1    REPORTER'S KEY TO PUNCTUATION

2    -- at the end of the question, answer or colloquy
     indicates interruption by another speaker
3
     . . . indicates while reading, words left out
4
     . . . . and the end of a line indicates a trailing off
5
     "Uh-huh" indicates affirmative
6
     "Huh-uh" or "huh-huh" indicates negative
7

8                            -   -   -

9                         I N D E X

10                           -   -   -

11

12   WITNESS:            DIRECT    CROSS    REDIRECT    RECROSS

13
     PAUL L. GINSBERG, M.D.
14
     BY MR. COFFEY         5
15   BY MR. MOWERS                   66
     BY MR. COFFEY                           111
16   BY MR. MOWERS                                        115

17
                          -   -   -
18           N O   E X H I B I T S   M A R K E D
                          -   -   -
19

20

21

22

23

24

25
```



1        VIDEOTAPED DEPOSITION OF PAUL L.GINSBERG, M.D.,

2                  Wednesday, March 22, 2017

3                          - - -

4        Videotaped deposition taken before Dona J.

5   Wong, Certified Shorthand Reporter, Registered

6   Professional Reporter, and Notary Public in and for the

7   State of Florida at Large, in the above cause.

8                          - - -

9        THE VIDEOGRAPHER:  Good morning, everyone.

10     We're now on video record.

11        Today's date is March 22nd, 2017.  The time

12     now is 10:23 a.m.  Swear in the witness.

13        THE COURT REPORTER:  Would you raise your

14     right hand.

15        (Oath administered.)

16        THE WITNESS:  I do.

17        THE COURT REPORTER:  Thank you.

18        MR. COFFEY:  This is Sam Coffey, counsel for

19     plaintiff.

20        Before we begin, the lawyers have agreed

21     there can be a standing objection to the mention

22     of Workers' Compensation which would be the

23     subject of a ruling and motions in limine.

24     We're doing this to try to keep the record

25     clean.  In the event the court allows the



```
 1        mention of Workers' Compensation, we'll have to

 2        edit out a bunch of objections.  All right.

 3   Thereupon,

 4                    (PAUL L. GINSBERG, M.D.)

 5   having been first duly sworn or affirmed, was examined

 6   and testified as follows:

 7                    DIRECT EXAMINATION

 8   BY MR. COFFEY:

 9        Q.   Doctor, could you please tell us your name.

10        A.   Yes.  I'm Dr. Paul Ginsberg.

11        Q.   Okay.  And my name is Sam Coffey.  I'm the

12   attorney for your patient, Mr. Ore.

13             Do you understand that?

14        A.   Yes.

15        Q.   Okay.  Could you tell us a little bit about

16   who you are and what you do for a living, please.

17        A.   Yes.  I'm a neurologist.  That's a position

18   that specializes in problems in the nervous system.

19             I am -- trained at the University of

20   Pennsylvania and then -- then University of Miami.  I am

21   board certified, been practicing in the Hollywood, South

22   Broward area for -- since 1976, I begun; 40 years, it

23   will be 41st year this year.

24        Q.   Thank you.  And you're licensed to practice

25   medicine within the State of Florida?
```



1      A.    I would hope so for all these years.

2      Q.    Very good.  I just -- it's just a requirement

3 for us -- for evidence in a trial like this.

4           We're presenting your testimony to a jury via

5 video deposition.  We have a trial coming up in June or

6 July of this year.  If called to trial, would that take

7 you away from your office practice here?

8      A.    Whatever city, yes.

9      Q.    And how many patients do you see in an average

10 day in your office setting?

11     A.    Oh, probably about 14, 14, 15.

12     Q.    All right.  Would that interrupt your

13 business, the ability to see your patients if you had to

14 come to court for a half a day or so in Miami?

15     A.    Of course.

16     Q.    Okay.  You said you're board certified.  Tell

17 us what the significance of board certification is for a

18 doctor within your subspecialty.

19     A.    Well, each specialty has a -- a -- sets of

20 standards for people that go -- that are qualified that

21 they're trained.  It indicates that their training is

22 adequate in that field, so they give -- the board --

23 each one has a board.  The board of neu -- what's called

24 the board of -- American Board of Psychiatry Neurology,

25 it's one board.  They have training examinations that



1   specify that you've done all the -- you've learned this

2   much material.

3        Q.   Okay.  Do you have hospital privileges,

4   Doctor?

5        A.   Yes, I do.

6        Q.   Where do you have hospital privileges?

7        A.   I have privileges at Memorial system,

8   basically Memorial Regional and Memorial South.  I just

9   actually go to Memorial South now.

10        Q.   Okay.  And your office is located where?

11   Where are we today?

12        A.   This is 12596 Pines Boulevard.

13        Q.   This is in Pembroke Pines?

14        A.   Yes.

15        Q.   Do you have an office anywhere else?

16        A.   Yes.

17        Q.   Where -- where else do you have an office?

18        A.   4925 in Hollywood, Sheridan Street in

19   Hollywood.

20        Q.   All right.  And do you practice in a group of

21   neurologists?

22        A.   Yes.

23        Q.   How many are -- are you in this practice?

24        A.   It depends on the way you define the practice.

25   Tenet, it's a huge thing.  There's multiple counties so



PAUL L. GINSBERG, M.D.                                March 22, 2017
ORE vs TRICAM INDUSTRIES                                          8

```
 1    I don't know all the members there.
 2         Q.   Fair enough.
 3         A.   There's about -- there's about -- here about
 4    six or seven neurologist sites --
 5         Q.   Very good.
 6         A.   -- that I work with over here.
 7         Q.   In this case, you've been a doctor of
 8    Mr. Ore's for several years.  Is that accurate?
 9         A.   Yes.
10         Q.   When's the first encounter, what's the first
11    date of treatment?
12         A.   I saw him on April 25th of 2012.
13         Q.   Okay.  And have you seen him recently as well?
14         A.   Yes.  Most recent being -- I have to look at
15    the number here -- 2/1/17.
16         Q.   Okay.  So February 1st of 2017?
17         A.   Yeah.
18         Q.   And about how frequently have you seen him
19    over the course of time?  Is it -- is it --
20         A.   He comes every couple months now, he gets his
21    shot.
22         Q.   Okay.  We'll probably cover a lot of the
23    medical care you provided to Mr. Ore, but before we go
24    into all that, I want to talk to you about a little
25    housekeeping.
```



```
 1              Today, is your deposition.  If you weren't

 2   sitting in a deposition right now, what would you be

 3   doing?

 4        A.   I'd be seeing patients.

 5        Q.   Okay.  Have you charged us for your time to --

 6   for -- for your services here to testify in this case?

 7        A.   Yeah, an hour's worth so far.  Yes.

 8        Q.   Do you know -- do you know what that charge

 9   is?

10        A.   No, actually, I don't.

11        Q.   Okay.

12        A.   The office takes care of it.

13        Q.   I -- I -- you have before you a stack of

14   records.  Correct?

15        A.   Yes.

16        Q.   Did I provide those to you?

17        A.   Yes, you did.

18        Q.   Okay.  Your chart, is that maintained in a

19   paper format or a paperless format?

20        A.   It should be paperless format.

21        Q.   Okay.  And you have a laptop computer in front

22   of you?

23        A.   Yes.

24        Q.   What is on the screen in front of you?

25        A.   It's a bunch of little yellow folders with a
```



1    bunch of dates --

2         Q.    Okay.

3         A.    -- some of which I was fortunate enough to

4    label as office visits so I can find them as opposed to

5    medication requests.

6         Q.    Is it easier for you to go through the paper

7    versus the computer to testify today?

8         A.    Yes, the -- yes, the print is larger and

9    it's -- it's easier to organize because you can sort of

10   look ahead --

11        Q.    Okay.

12        A.    -- and find things, whereas here you're

13   searching every one even though -- there's no search

14   engine that really gets you through those other folders.

15        Q.    Yes, sir.  I highlighted some of those records

16   for my purpose before I came here today, but I provided

17   you the highlights in the records so you'd have a full

18   set in front of you.

19             Can we agree the highlights won't influence

20   how you testify in this case?

21        A.    Absolutely.

22        Q.    Okay.

23        A.    Correct.

24        Q.    And, for the record, I highlighted on the

25   first visit of April 25, 2012, and then on August of



 1 | 2013, where I think you rendered a disability rating,

 2 | are two of the highlighted documents.

 3 |     A.   Okay.

 4 |     Q.   I've also provided you with the record of

 5 | Dr. Guillermo Pasarin, a neurosurgeon; there's some

 6 | highlights on that record as well.

 7 |     A.   Okay.

 8 |     Q.   Did I also share with you page 21 of the

 9 | report of Ira Morris during our conference?

10 |     A.   Yes, you did.

11 |     Q.   Okay.  And does that note there that's

12 | highlighted on that page, does that memorialize a

13 | conference you had with Ira Morris who's another expert

14 | we retained in our case?

15 |     A.   Yes.

16 |     Q.   Okay.  I'm going to begin then.  Let's go back

17 | all the way to the beginning in April of 2012 and could

18 | you tell us a little bit about your first encounter with

19 | the patient, please.

20 |          When he came to see you, did he provide you a

21 | history?

22 |     A.   Yes.

23 |     Q.   Tell us what he told you about had happened to

24 | him in the recent past and more distantly that's

25 | significant for your care and treatment that you



PAUL L. GINSBERG, M.D.                          March 22, 2017
ORE vs TRICAM INDUSTRIES                                 12

1  provided to Mr. Ore.

2      A.   Yes.  He had -- he told me he had fallen off a

3  ladder on April 6th of 2012.  He estimated the distance

4  at 12 feet and he -- he said he fell more to the right

5  and he did lose consciousness for a few minutes is what

6  he estimated.  And then he --

7      Q.   You're -- excuse me -- you're seeing him about

8  19 days after that accident.  Is that correct?

9      A.   Yes.

10     Q.   Okay.  Please continue.

11     A.   He had pain when he woke up there.  Because of

12  the head injury and the -- and pain he was taken to

13  Memorial Hospital.  It's a major trauma center locally

14  in South Broward.  And he was seen by the neurosurgery

15  group -- surgical group there.  I think Dr. Sternau was

16  his doctor who's not there anymore with them but she's

17  a -- a neurosurgeon.  And C.T. was negative.  I think he

18  either said there -- I don't remember how I -- how I got

19  that, but I know the C.T. was negative and the -- plus

20  the C.T. and M.R.I. of the neck were negative.

21     Q.   Okay.  When you say C.T. and M.R.I. of neck

22  were negative, what do you mean by that?

23     A.   It didn't have any fractures.

24     Q.   Okay.  Please continue.

25     A.   It's sort of not a normal protocol.  When



 1   someone comes in after trauma, they always do a C.T. of

 2   the brain and C.T. of the neck to make sure they're not

 3   missing anything.

 4        Q.   Okay.  Please continue.

 5        A.   So then -- but he was -- except for several

 6   discs -- he was felt to have several discs.  That was

 7   the one thing they did describe.

 8        Q.   When you say someone has several discs, what

 9   do you mean, Doctor?

10        A.   That there -- that the discs had degenerated

11   and they -- they had -- that protruded outwards.

12        Q.   Is that abnormal?

13        A.   It's abnormal, yes.

14        Q.   Okay, thank you.  I'll stop you from time to

15   time, if you say something that may be a little bit

16   medically complicated, to have you explain it to our

17   jury.

18        A.   Sure.

19        Q.   Is that okay by you?

20        A.   Yes.

21        Q.   Okay.  Please continue, Doctor, with the

22   history.

23        A.   He said that -- it was supposedly the most

24   important part, if you look at the report, there's no

25   cord compression and --



 1      Q.   When you talk about cord, Doctor, you're

 2  speaking about the spinal cord?

 3      A.   Spinal cord, yes.

 4      Q.   Okay.  And why is it important if there's no

 5  cord compression for a patient like this after a trauma

 6  like you've described?

 7      A.   Because then they have to have it decompressed

 8  because spinal cord damage is -- can be reversible, and

 9  you want to make sure it's not hitting enough to cause

10  damage.

11      Q.   Sure.  When you say "decompression," is that

12  another word for surgery?

13      A.   Yes.

14      Q.   Okay, thank you.  Please continue.

15      A.   Then I wrote down here that he -- evidently,

16  he said he felt he couldn't move his arms or legs

17  initially.  And this -- this got better rapidly,

18  evidently, so that's why we would be concerned about

19  spinal cord compression.

20      Q.   Okay.

21      A.   But he didn't have it according to the C.T.

22  That's why they do that --

23      Q.   Okay.

24      A.   -- and -- and then I wrote down that they said

25  about that, there was some narrowing of the left



```
 1    foramen.  That's where the nerve comes out.  And there
 2    was a central disc off to the left of C6-7 but did
 3    not -- which did not affect the cord or the root that
 4    was going out.  And he had some bulging discs below
 5    which are less significant.
 6             And they said he didn't have any arm
 7    fractures.  C.T. of the brachial plexus was normal.
 8    M.R.I. of the right shoulder showed a rotator cuff
 9    injury.
10             Usually, I get this information, by the way,
11    from the hospital record because I can -- I can go
12    directly to the hospital record so I just sort of read
13    it as I'm going along --
14        Q.    Fair enough.
15        A.    -- and then get the essence of it.
16        Q.    Okay.
17        A.    He -- he had an old joint injury of the
18    acromioclavicular joint which is where the clavicle
19    meets the shoulder, but that was supposed to be old.
20             Let's see.  He had a -- some inflammation of
21    the bursa, called bursitis, and he had tearing of the
22    cartilage around the joint of the shoulder.
23        Q.    Are those indications of shoulder injury,
24    Doctor?
25        A.    Yes.
```



1      Q.    Okay.

2      A.    He said there -- yeah, he said there was

3  some -- according to -- again, this is from the report,

4  more orthopedic problems, but they said there was

5  inflammation of the -- of the shoulder -- of the --

6  there's tearing of the labrum and the -- and he felt

7  there was a tendon problem in the proximal biceps

8  tendon.

9      Q.    Okay.

10     A.    Let's see.  There was no fractures, that's the

11  orthopedic chart in there.  So I mean, he was still

12  having pain.  They said it was in his right arm.  The

13  arm was in a sling, and he felt it was difficult to both

14  extend and flex the arm.

15     Q.    At that time, was his arm still swollen and

16  bruised from in -- what you wrote down?

17     A.    Yes.

18     Q.    Okay.  What's the significance of having, 19

19  days after an accident, a swollen and bruised arm?

20     A.    Well, it's still -- still -- some injury is

21  still there.  It -- bruising goes down but that can last

22  for a couple of weeks, so -- a few weeks as far as I

23  know.  Again, it's orthopedic stuff, for the orthopedics

24  but I believe you can have pain that -- from a -- from

25  either tendon injuries or --



1      Q.   Yes, sir.

2      A.   -- or some other under -- underlying injury

3   which can last longer.

4      Q.   Okay.

5      A.   And then I noticed that he -- this is the part

6   that's gets more neurological -- if he turns his head to

7   the right, he gets some local pain in the neck which did

8   not affect the right arm.  He claimed tingling of the

9   three -- of the last three fingers of the -- of the

10  right arm -- of the right hand.

11     Q.   Could you do me a favor, Doctor.  Your laptop,

12  are you using that screen at the moment?

13     A.   No.

14     Q.   Could you just fold it down.

15     A.   That will be my pleasure.

16     Q.   I can see from my angle you're pointing to

17  your middle --

18     A.   I'm sorry.

19     Q.   -- your ring and your pinkie finger --

20     A.   Yes.

21     Q.   -- but the video camera could not pick that

22  up --

23     A.   Okay.  These three fingers.  (Indicating.)

24     Q.   Thank you, Doctor.  I appreciate that.

25          What's the significance of complaints about



1  tingling or pain or changes in those fingers at the time

2  you saw him?

3       A.   That might indicate some nerve-root problem or

4  some local nerve problem.

5       Q.   Okay.  Please continue.

6       A.   He says, as far as memory, wasn't as good.

7       Q.   Tell us about that.  Tell us about what he

8  complained about in terms of memory and what your

9  findings were from your examination, please.

10      A.   Well, he was just more forgetful, that he had

11  to repeat himself.  He -- he just didn't remember what

12  he had said; if he said something, he had to repeat

13  things, and he couldn't focus.  These are common

14  problems after concussions.

15      Q.   Did he complain about visual problems as well?

16      A.   Yes.

17      Q.   What's the significance of that?

18      A.   Well, he -- he told me he had problems that --

19  that he couldn't focus his eyes well, but he said if he

20  closed the left eye, he'll start to see double out of

21  the right eye, which really suggests more of an ocular

22  problem, more of an eye problem than a neurological

23  problem.

24      Q.   Okay.  Was he taking medications at the time

25  for the pain?



1       A.   They gave him, the E.R., the hospital,

2  tramadol which is a semi-narcotic and Percocet which is

3  a known narcotic.

4       Q.   Okay.  Were those appropriate medications for

5  the injuries that you saw for this patient?

6       A.   Yeah.  Yes.

7       Q.   Okay.  I don't have your note in front of you

8  so what section are you in now?

9       A.   Well, I can -- the rest is just boilerplate

10  stuff that he did on physical examination.

11       Q.   What I'd like to do on the physical

12  examination -- tell us what a physical exam is first,

13  Doctor.

14       A.   A physical exam is where you actually look at

15  the patient and you try and find something in that's --

16  you elicit something which will sort of confirm or --

17  suspected abnormalities and define the abnormalities

18  that he's complaining about.

19       Q.   Okay.  Is the physical examination part of

20  your typical patient encounter for many of your visits?

21       A.   Yes.

22       Q.   Okay.  And positive findings, is that where

23  something is abnormal?

24       A.   Yes.

25       Q.   And if it's negative, that's where something



PAUL L. GINSBERG, M.D.                               March 22, 2017
ORE vs TRICAM INDUSTRIES                                         20

```
 1   is normal.  Correct?
 2        A.   That's correct.
 3        Q.   Okay.  Can -- over the course of your
 4   deposition, I want to talk to you about the significant
 5   positive findings that you find on your physical
 6   examination and your other tests that you performed.  Is
 7   that a fair thing to do?
 8        A.   Yes.
 9        Q.   Will that speed up going through your record?
10        A.   Hopefully.
11        Q.   Okay, very good.  Why don't you just scan
12   through and tell us what you found was significant in
13   terms of your examination, and after that we'll talk
14   about your impression for day one.
15             What was significant in terms of physical exam
16   on day one?
17        A.   Well, he had some limitation in the movement
18   of his neck.  He could go better to the left than the
19   right, but like 60 degrees and 45 degrees.  These are
20   estimates I usually make.
21        Q.   Yes, sir.
22        A.   Sixty means it's two-thirds of the way over,
23   45 degrees is halfway over, so. . . .
24        Q.   Would you do me a favor and kind of turn your
25   neck and show what the restriction would have been.
```



PAUL L. GINSBERG, M.D.                              March 22, 2017
ORE vs TRICAM INDUSTRIES                                       21

1      A.    Usually -- usually, normal rotation would be
2  like 60 to 70 degrees.
3      Q.    Yes, sir.
4      A.    So leftwards he was pretty good, it's like 60
5  would be here, it's about here actually.  (Indicating.)
6      Q.    Okay.
7      A.    And to the right, he -- he went 45 at the
8  time.
9      Q.    Okay.
10     A.    So it's halfway through which is --
11     Q.    Fair enough.  Please continue.
12     A.    -- trigonometry suggests it's 45 degrees.
13           And he had tenderness over his spine directly.
14  And then his shoulder, I say obvious deformity.  It
15  means that it's -- it's just like -- sometimes you can
16  see -- actually see it separated out a little bit, so it
17  looks like it separated at the -- the -- you can sort of
18  feel the bone a little bit below the acromion which is
19  the -- part of the scapula there.
20     Q.    Was that painful for him when you did your --
21  did you touch him?
22     A.    Let's see.  Well, it -- I -- I didn't mention
23  over there.  I did mention the elbow.  The moving him,
24  trying to move that caused pain.
25     Q.    Well, tell us -- tell us in terms of looking

1   at the arm what the significant issues were.

2        A.   He's -- he had a swollen arm and it was

3   still -- it was still an acute injury.  That's what --

4   that's what the whole point of this is.  There was still

5   something acute going on.  It wasn't the -- just because

6   they discharged him from the hospital, it doesn't mean

7   that everything is fine at that point which is quite

8   common.

9        Q.   Yes, sir.

10       A.   Let's see.  Pertinent and negative.  I just --

11  if somebody said, I didn't find anything wrong objective

12  with his mental status just talking to him.

13       Q.   Yes, sir.

14       A.   And the -- the motor examination was in a

15  sense not fully objective because he -- if you have a

16  pain, you can't judge weightlessness, it's not fair to

17  do that on a patient, so I just mention that, you know,

18  it's a -- it's -- it's been called antalgic

19  pseudoparesis or pseudoparalysis which means that if you

20  hurt a lot -- what I tell people, it means if I took a

21  hammer and broke your elbow and ask you to me push away,

22  you probably couldn't do it but you wouldn't say it's

23  because the muscles are weak, you'd say because he --

24  this neurologist broke my elbow.  That's what I mean.

25            So he had -- so it's very difficult to say

1   exactly, but he did seem to have pretty good strength in

2   general.

3           The -- the deltoid seemed to work which is the

4   most important muscle relative to his injury, and the --

5   the muscles further down seemed to basically work.  I

6   didn't see a major abnormality of strength --

7       Q.   Okay.  Are you in your --

8       A.   -- except the elbow muscles which I did not

9   test because it was hurting him too much.

10      Q.   -- are you in your impression?

11      A.   I'm getting there.

12      Q.   Okay.

13      A.   Sorry.

14      Q.   That's no problem.  I apologize to you.

15      A.   And then I didn't find anything -- again,

16  usually, I'll skip these negatives, but some of them are

17  relevant negatives.  He didn't have any sensory loss

18  when I stuck him, which is -- you know, he's had

19  tingling in the three fingers; I couldn't find that.

20          And his reflexes were -- were really preserved

21  but, again, it's incomplete because I couldn't test him

22  on the elbow because he hurt too much, he'd start

23  banging over there.

24          Let's see.  So then I -- that gets me to my --

25  everything else was -- these are not contributory or



PAUL L. GINSBERG, M.D.                                    March 22, 2017
ORE vs TRICAM INDUSTRIES                                            24

 1  negative.

 2       Q.   Okay.

 3       A.   So impression was that he probably had a

 4  concussion.  Of course, a lot of people have these

 5  same -- the -- have these same type of complaints of

 6  focusing and memory, even though you don't find a lot of

 7  them, but that often persists for several months.

 8            He had some discs, according to what they

 9  said, but I didn't think these were causing what's

10  called neurogenic pain.

11            What I mean by that, if you ask me, is that if

12  you have a spine problem, the question is whether it's

13  causing -- there's two ways it can hurt you.  I mean,

14  one, it could -- it could pinch a nerve over, or two, it

15  just hurts by itself.  If you break a bone, it hurts by

16  itself.  It doesn't mean the pain is any less real than

17  if you hit a nerve but it's a different approach.  You

18  tend to be more conservative in management of -- of just

19  local pain.  So I thought his pain was -- the term is

20  either somatic or less receptive.  I usually use less

21  receptive because people associate somatic with

22  psychosomatic which is not what I mean but it means it's

23  local.  And I thought his pain was more local than that

24  from -- and it wasn't like neurogenic pain.  That was my

25  opinion at the time.



1          And so let's see.  So -- and I -- I pointed

2    out to you he didn't have any numbness or definite

3    weakness in the area which would be affected by L -- C5

4    when I saw him, and basically that was all, so I -- I

5    thought it was mostly a concussion type of problem and

6    that the neck was probably not the major injury over

7    here and that there seemed to be some problem in his

8    shoulder.  But that was my -- the part being the

9    neurologist.

10        Q.    Okay.  Did you -- did you recommend any

11   treatments on that first day in your plan or was it just

12   to come back in -- in time to see you again?

13        A.    Let's see.  Well, I said I would just see him

14   again, that's basically it.

15        Q.    Did you prescribe any medications or did he

16   already have the medications from the hospital --

17        A.    No, I said what he's one is -- is plenty for

18   pain.

19        Q.    Okay.

20        A.    He didn't need anything more than that.

21        Q.    Do you see him next on June 13 of 2012?

22        A.    Looks like that's -- yes.

23        Q.    Is he doing about the same?

24        A.    Yeah.  Let's see.

25        Q.    Was it getting better?



PAUL L. GINSBERG, M.D.                                          March 22, 2017
ORE vs TRICAM INDUSTRIES                                              26

```
 1        A.   He seemed to be a little bit better.

 2        Q.   Okay.

 3        A.   But his arm is -- he was moving it a little

 4   tiny bit better, because he was able to take the sling

 5   off.  That was -- before he couldn't do that.

 6        Q.   Okay.

 7        A.   And he was starting to do some range of motion

 8   exercises which is important for anyone with a shoulder

 9   problem.

10        Q.   Okay.

11        A.   The swelling seemed to be down.  Okay.

12        Q.   You treated him from --

13        A.   Yeah, he was -- also, he was able to focus

14   better.  He said he was like doing some -- some audio

15   work.  I'm not sure what I mean by that.  But something

16   in his own house, work, he was able to do it,

17   concentrate for about an hour, so his focusing seemed to

18   be a little bit better.

19        Q.   Okay.  You as --

20        A.   And then --

21        Q.   -- you as a neurologist, were you focusing

22   upon the orthopedic problems this man was facing?

23        A.   No.  I was trying to just see if there was a

24   neurological addition to that.

25        Q.   Okay.  Do you understand that over the course
```



 1  of time he has been treated by Dr. Ellowitz and he's had

 2  a couple of shoulder surgeries?

 3       A.   Yes.

 4       Q.   Okay.  Would you defer to Dr. Ellowitz with

 5  respect to the orthopedic aspects of Mr. Ore's care --

 6       A.   Yes.

 7       Q.   -- and recovery?

 8            Okay.  So on the second day, what did you

 9  recommend?

10       A.   Let's see.  Well, I -- I -- I didn't think he

11  needed further testing because he seemed to be getting

12  better.

13       Q.   Okay.

14       A.   I'm pretty conservative, the guy is getting

15  better, I don't do --

16       Q.   Yes, sir.

17       A.   -- the tests.  And he -- he was getting -- the

18  therapist mentioned that -- thought that maybe he can do

19  a little range of motion of his neck, might help him.

20       Q.   Okay.

21       A.   And he was tired of taking Percocet, which is

22  pretty strong, so I gave him some -- it's oxycodone.  I

23  gave him something called Vicodin which is a brand name

24  -- old brand name for -- for hydrocodone.  It's a little

25  less strong --



PAUL L. GINSBERG, M.D.                                      March 22, 2017
ORE vs TRICAM INDUSTRIES                                                28

 1          Q.    Okay.

 2          A.    -- even though now it's still considered a

 3     class two narcotic.

 4          Q.    Did you --

 5          A.    And he was -- so it was more for his pain, so

 6     he -- because I thought he could go down a little bit on

 7     his pain pills.

 8          Q.    Did you recommend he come back to you in about

 9     six weeks?

10          A.    Yes.

11          Q.    Did he see you again in August of 2012?

12          A.    A duplicate.

13          Q.    I apologize.

14          A.    Okay.  August, yes.  There's an August note.

15          Q.    Okay.  What was his chief complaint when he

16     came back in August?

17          A.    Let me - I can clarify if there's no other

18     things in between.  If you give me one second.  Yeah,

19     that looks about right.  Yes.  Okay.

20                But then he had -- seemed to have had a

21     shoulder operation already with Dr. Ellowitz.

22          Q.    Okay.

23          A.    I thought it was Berkowitz but I did mention

24     Berkowitz once because I -- it's the same --

25          Q.    I think you've seen them both --



1      A.   -- orthopedist.  I know they are both

2  orthopedists, but whoever was his orthopedist.

3           He already had surgery on it, and he said it

4  was a large procedure but I did not get the details of

5  it.  He said it was -- there was -- he was told it was a

6  biceps tendon tear which was not apparent on his M.R.I.

7  and he had some sort of tendon transplant or whatever

8  they do for those things, with a major reconstruction,

9  is what he described to me.  And he had not had --

10  restarted the post-op surgery.  Let's see.  He was still

11  using a sling and there was really nothing else that was

12  new as far as his complaints go.

13      Q.   Was he still complaining of headaches?

14      A.   Yeah, he had some posterior headaches.

15      Q.   Okay.  And did you, again, prescribe

16  medications to him for pain?

17      A.   Yeah, he -- yes, he preferred, again, the less

18  strong narcotic.  The other one was giving him

19  constipation so I gave him some hydrocodone because he

20  felt that -- he really didn't want to use the stronger

21  one, the Percocet.

22      Q.   The therapies that -- was he in therapy at

23  that time or was that --

24      A.   Well, they were prescribed -- the acute

25  surgery, I think they held it for a few weeks, is my



PAUL L. GINSBERG, M.D.                                    March 22, 2017
ORE vs TRICAM INDUSTRIES                                              30

1   understanding, and then they were going to restart it

2   again.

3        Q.   Yes, sir.  Okay.  Did you recommend he come

4   back to you again later?

5        A.   Yes, because I said just come back in about

6   two months, eight weeks, and I'll re-evaluate him --

7        Q.   Okay.

8        A.   -- because right now everything is kind of by

9   the -- orthopedic problems.

10       Q.   Did you see him again in October?

11       A.   Yes.  This is out of order.  Let me just fix

12  this.

13       Q.   I apologize.

14       A.   Yeah.  Yes, I did see him in October,

15  October 10.

16       Q.   Okay.  And anything significantly different on

17  that date?

18       A.   Let me -- yes.  He -- he -- in relying on the

19  neurological part of it, he was saying his mind, his

20  memory was still a problem.  Even -- and, you know, he

21  was still having trouble focusing which, again, people

22  do have after concussions.  So I said just make sure

23  there's nothing else that was missed earlier, maybe do

24  another M.R.I. of his head -- or actually an M.R.I., not

25  another one because that was the first M.R.I.  The C.T.



```
 1    was negative but maybe you will see something that will

 2    do it, and I also suggested maybe neuropsychological

 3    testing which is -- basically, I tell patients it's like

 4    a glorified I.Q. test where you try to -- where they try

 5    to tell different areas of brain functions and they

 6    can -- they can tell from that whether the brain is

 7    organically functioning right or not.

 8         Q.   How was his sleeping and his headaches?

 9         A.   He was still having daily headaches and I

10    don't remember where I put anything about sleeping on

11    this, but you may have seen it.  I know he was still

12    having headaches.

13         Q.   Okay.  I'll move along.

14              Did he come back to you on the 24th of October

15    of that year?

16         A.   I didn't say that but let me just find it over

17    here, please.  I don't have that note is the problem.

18         Q.   Okay.

19         A.   Let me see -- it looks like there was one

20    that's not -- that was when we were in between paper

21    and -- and -- I don't have that note and I can't tell

22    you whether --

23         Q.   Let me do this.  Excuse me a second.

24         A.   You had -- you didn't put that in.

25              MR. MOWERS:  Let's go off the record.
```



```
 1              THE VIDEOGRAPHER:  Okay.  We're off video
 2      record.
 3              (Discussion held off the record.)
 4              THE VIDEOGRAPHER:  All right.  We're back on
 5      video record.  It's 10:52 a.m.
 6              THE WITNESS:  Wait a minute before you get
 7      back, wait before you get back, let me make sure I
 8      have that.
 9              THE VIDEOGRAPHER:  Do you want to go off
10      record?
11              THE WITNESS:  One second.  This is the last
12      one, 10/24.
13              THE VIDEOGRAPHER:  Okay.  We're off -- we're
14      off record.
15              (Discussion held off the record.)
16              THE VIDEOGRAPHER:  Okay.  We're back -- we're
17      back on video record.  It's 10:53 a.m.
18    BY MR. COFFEY:
19         Q.   Okay.  Doctor, you took a little break to find
20    the October 24, 2012, note and the M.R.I. report of
21    October 18, 2012.  Do you have those both before you?
22         A.   Yes.
23         Q.   Tell us about the significance of those two
24    documents, please.
25         A.   Okay.  The -- he came back on 10/24.  He had
```



1   had his M.R.I. of the brain, wanted to know what it

2   meant, so I looked at the M.R.I. report at the time, and

3   what it's describing -- it's actually a fairly normal --

4   a normal looking M.R.I. for a gentleman his age.

5           As people get older, they often get like these

6   nonspecific white matter spots that have been called

7   different things over the years.  The term

8   leukoaraiosis was popular.  There was -- they used to

9   call them unidentified bright objects but they -- now

10  they call them nonspecific ischemic changes, but they --

11  people just get them as they get older.

12          He had one single one which at his age is not

13  really related to any particular symptoms and that's all

14  that was basically.  He -- that's all I felt that it was

15  related to.

16      Q.   Okay.  Did he calm down after you talked to

17  him about it?

18      A.   Yes.

19      Q.   Okay.  And what did you recommend on that day?

20      A.   To -- to, one, be calm and he go -- and he's

21  supposed to get neuropsychological testing.  I said,

22  Just get that done, don't worry about it.  This -- don't

23  worry about the M.R.I.  And the original plan was to get

24  back in two months.  I thought that was adequate.

25      Q.    Okay.  And did you see him again on the 12th



 1  of December of 2012?

 2      A.   Yes.

 3      Q.   And what were you doing from -- what was he

 4  complaining about at that time and what were you doing;

 5  what were you recommending to him?

 6      A.   Okay.  He had persistent headaches so I

 7  suggested what's called a simple nerve block or

 8  sometimes it's called trigger -- splenius capitis

 9  trigger point.  They're probably identical but

10  they're -- they're basically giving a -- trying to numb

11  up the nerves that go to the back of his head where he's

12  having pain.

13      Q.   How would you do a nerve block?  Tell us what

14  the procedure is.

15      A.   You know, you -- you locate -- you try to

16  locate the real tender point.  Often you can find a

17  little spasm muscle around there.  That's where the

18  muscles often spasm and the nerve usually comes out

19  just -- just medial to it, just inside of it, and

20  there's a little notch over it so you try to get both

21  areas.

22      Q.   And what do you do to --

23      A.   I just -- you just stick a needle in there and

24  you inject this medication, use a local anesthetic.  I

25  usually -- mixing it with another substance called



PAUL L. GINSBERG, M.D.                                     March 22, 2017
ORE vs TRICAM INDUSTRIES                                            35

 1  Sarapin which is an organic extract.  It's supposed to
 2  make it last longer.  And I was going to see if that
 3  helped him.
 4       Q.   Okay.  Did you have the benefit of the
 5  neuropsychological testing report back at that time?
 6       A.   My note indicates yes.
 7       Q.   And how did that look?
 8       A.   He said he did actually very well on it.
 9       Q.   Okay.
10       A.   He had emotional problems from stress.  And
11  according to -- my interpretation of his report was that
12  the -- the organic function, as I -- again, I -- I
13  usually refer to that as the hardware of his brain --
14  was good.  The software was where he was getting a
15  little emotional, he was getting depressed but the
16  hardware seemed to be fine.  And, you know, she -- since
17  he felt it was depression, I said, you know, you can --
18  I agreed with the recommendation that maybe the
19  psychologist can give him some therapy for a couple of
20  months since he was depressed.  After the accident, he
21  hadn't been working.
22       Q.   Okay.  What were the recommendations --
23       A.   Let's see.  He was -- had been -- he had been
24  on sertraline, which maybe -- I don't know if his
25  medical doctor had given it or not.  Sertraline is an



1  antidepressant.  He agreed to restart it for him since

2  it was related to the accident, and I redid his

3  hydrocodone.

4       Q.   Okay.  Did you make surgical re -- or therapy

5  recommendations, or was he in therapy?

6       A.   He was in therapy.

7       Q.   Okay.  Do you see him back in January of '13?

8       A.   Yes.  January 9th actually.

9       Q.   Had you done nerve blocks up to this point in

10 time?  When do you begin the nerve blocks that you

11 recommended?

12      A.   I'm sorry, what's your question?  I did do

13 nerve blocks.

14      Q.   I'm trying to find out when you began the

15 nerve blocks.

16      A.   Well, that was the first one.  Here, it looks

17 like I did another one.

18      Q.   So on 12/12 you did nerve blocks for the first

19 time?

20      A.   Yes.

21      Q.   Okay.  And how was he doing when he comes back

22 to you on January 9th, 2013?

23      A.   He said it helped him for three weeks.

24      Q.   Okay.

25      A.   He got three weeks relief with that.



PAUL L. GINSBERG, M.D.                                      March 22, 2017
ORE vs TRICAM INDUSTRIES                                              37

1  That's -- that's a pretty benign thing to do so I said

2  I'll be happy to repeat it.

3          He also thought that the antidepressant was

4  helpful so I said he should continue that.

5      Q.    The anti --

6      A.    Yeah, the antidepressant.  He claimed that he

7  was using less than the narcotics.

8      Q.    Which is the antidepressant?  Which

9  medication?

10      A.    Sertraline.  That's -- it used to be sold in

11  the brand name of Zoloft.

12      Q.    Okay.

13      A.    And since he got three weeks, I said, Well,

14  that's better than what you're getting before, I'll

15  repeat.  I rather do that, give him that than -- than

16  give him -- keep him on narcotics and pills so I -- I

17  repeated the injections.

18      Q.    Okay.  What were this man's chronic problems

19  at this time?

20      A.    Well, the neuro -- well, the neurological ones

21  were basically headache, and he had pain around the

22  right shoulder and neck, but the -- the right shoulder

23  and neck I thought was more of a neuro -- an orthopedic

24  problem.

25      Q.    Okay.



PAUL L. GINSBERG, M.D.                                    March 22, 2017
ORE vs TRICAM INDUSTRIES                                           38

1    A.   So his major problems neurologically was his

2    complaints of poor memory which seemed to be more

3    emotional than -- than physical, and the -- the -- and

4    he probably had some depression, so -- and -- and the

5    orthopedic stuff accounted for most of the rest of his

6    symptoms.

7    Q.   Was he still suffering from the effects of the

8    concussion at this time in January of 2013, Doctor, in

9    your opinion within a reasonable degree of medical --

10   A.   He said so but I couldn't measure them so I

11   thought that the -- that was probably -- probably more

12   or less gone by that point, his concussion part.

13   Q.   Was he still complaining about arm pain?

14   A.   Yes.

15   Q.   Okay.  You next see him when?

16   A.   That was the 9th, and the next was 2/13,

17   February 13th of 2013.

18   Q.   Okay.  Just tell us the highlights, the

19   significant changes, if any, and what you did.  They're

20   essentially --

21   A.   This time I just did a -- basically another

22   shot.  That was -- he said that again it worked, helped

23   him this time about four weeks.  He was gaining a little

24   bit more so I repeated the -- I repeated the shots so I

25   just gave him a shot that time.



PAUL L. GINSBERG, M.D.                              March 22, 2017
ORE vs TRICAM INDUSTRIES                                        39

1        Q.   Okay.  When do you see him next?

2        A.   It looks like March 20th of 2013.

3        Q.   Any significant changes and what did you do?

4        A.   Repeated his nerve blocks again, and he told

5    me he had hit M.M.I. by his orthopedist.

6        Q.   What is M.M.I., Doctor?

7        A.   Maximum medical improvement.  There's some

8    point where you have to say, you know, this is -- the

9    patient is stable at this point and probably not going

10   to get better.

11       Q.   Okay.

12       A.   So I felt his -- I didn't see any other

13   neurological restrictions at the time.

14       Q.   Okay.  When did you see him next?

15       A.   The next note I have is 7/17.  Let me see if

16   that's correct.  Yes, that's correct.  Next note will be

17   7/17.

18       Q.   Was this a longer encounter?

19       A.   Yes.  Yeah, I just done testing -- just did

20   the procedure before.

21            Okay.  I just wrote it out.  So -- okay.  So

22   he -- he complained of -- at that time he wanted --

23   summary, a quick summary, he was still having his

24   headaches.  He was using much less of the hydrocodone so

25   that -- so the indication he was having less pain; he

PAUL L. GINSBERG, M.D.                                        March 22, 2017
ORE vs TRICAM INDUSTRIES                                                40

```
 1   would cut it into little pieces and take it.  Still

 2   thought the shots were useful.

 3            He had -- he was still seeing a -- he had --

 4   he wanted to see a psychologist.  I'm not sure he had

 5   actually been there at that time.

 6            And he said -- he said he was released by the

 7   orthopedist, and now he had -- he said along the way he

 8   thought he had maybe some visual problems, the right

 9   hemifield.  He saw Dr. Ciliberti who used to be with us

10   many, many years ago.  He's a neuropharmacologist.  And

11   the -- there's an M.R.I. done and, evidently, it looked

12   grossly normal except for the punctate subcortical focus

13   attenuation so I couldn't really see how that could

14   account for a field cut and I deferred to Dr. Ciliberti,

15   if he could find there was something there.

16        Q.   Okay.  Any other recommendations for that

17   office visit?

18        A.   Well, let me go over my note.  Let me see.

19        Q.   And you next see him in --

20        A.   Yeah.

21        Q.   -- August.  Correct?

22        A.   Right.  We had talked about other treatments

23   and I didn't think anything else was there and I said

24   there would be -- therefore at the time I was giving

25   him -- rating him at maximum medical improvement, but I
```



1  didn't want to give him a rating until I had a chance to

2  look at it.  I still said he probably should see a

3  psychologist, not just get an antidepressant from me,

4  and I said, it's noted, a little more physical therapy

5  wouldn't hurt.

6       Q.   This is August of '13?

7       A.   No.  That's August the -- I'll tell you

8  exactly.  That was July 17th of 2013.

9       Q.   Okay.

10      A.   No, August he comes back.

11      Q.   You see him August 21, 2013.  Correct?

12      A.   Yes.  That's his next note too.

13      Q.   Do you place him at maximum medical

14  improvement as of this date?

15      A.   My notes seem indicate I -- I said I would --

16  I put him on that but I didn't rate him on the 7/17

17  note.

18      Q.   That august 21, 2013 --

19      A.   I did do a rating.

20      Q.   Okay.  All right.  And let's go through that

21  note.  How is he doing at this time?

22      A.   He says, headaches, as long as he gets those

23  shots he was pleased with the way the headaches were

24  going, so he still was getting relief from that.

25      Q.   How long was he getting relief for after you



PAUL L. GINSBERG, M.D.                                     March 22, 2017
ORE vs TRICAM INDUSTRIES                                              42

1   give him injections?

2       A.   Gave him relief, well, about three, four weeks

3   at a time.

4       Q.   Okay.

5       A.   I was seeing him every four weeks.

6       Q.   All right.

7       A.   He still -- he said -- he claimed he still had

8   pain in the right shoulder, goes down to the trapezius

9   muscle of the neck and that is what I thought he --

10  that's what he complained of.

11      Q.   Okay.

12      A.   Then I rated -- I did see him and gave him the

13  shots, same way as before, and then I said he did --

14  he -- he did -- he's been the same so I gave him M.M.I.

15  at that time.

16          He -- I said, according to my interpretation

17  of Florida guides, since he did have some discs and

18  they -- they could certainly -- that type of injury

19  could -- that he described, could make that worse, that

20  just the presence of a disc gives him about a

21  five percent for one, and six percent if you have two,

22  and I didn't think he needed any more than that because

23  he didn't have any neurological complaints from it or

24  spinal cord complaints, so I gave him the six percent.

25  I believe the way to combine it with the orthopedist

1   would come out to 23, but that's the --

2        Q.   Okay.  Let me stop you there for a moment.

3        Do you have an understanding one of his

4   orthopedics had given him a -- a disability rating or,

5   rather, an impairment rating separate and apart from --

6        A.   Yes.

7        Q.   -- what you were doing?  Okay.

8        And do you have an understanding that that

9   rating was how many percents?

10       A.   It was 18 percent.

11       Q.   Okay.  Did you see a report from that doctor?

12       A.   I don't remember that, to be honest.  I have

13   no recollection of seeing that.

14       Q.   Okay.

15       A.   Whether he told me that or --

16       Q.   Does your note indicate you saw the report, or

17   is this Mr. Ore telling you this?  I don't know the

18   answer to the question.

19       A.   Well, I said I do not have the result in front

20   of me --

21       Q.   Okay.

22       A.   -- so I suggested I just got it from what he

23   told me.

24       Q.   All right.  In addition to what the orthopedic

25   would render in terms of a rating, you came to --



PAUL L. GINSBERG, M.D.                                    March 22, 2017
ORE vs TRICAM INDUSTRIES                                              44

1        A.    A small --

2        Q.    -- an impairment rating from a neurological

3   perspective?

4        A.    Yes.

5        Q.    Okay.  And what's the significance of an

6   impairment rating in a case -- for a person like this?

7   From your perspective, a neurological perspective,

8   Doctor.

9        A.    It means that the -- you can anticipate having

10  certain residual problems afterwards that won't go away

11  since you've now stabilized certain complaints.  And

12  even -- even potential complaints.

13       Q.    Okay.  And do you have an opinion within a

14  reasonable degree of medical probability as of

15  August 21, 2013, whether or not Mike Ore had a permanent

16  impairment as a result of the accident, from the fall

17  off the ladder?

18       A.    Yes.

19       Q.    Okay.  Please tell us your opinion within a

20  reasonable degree of medical probability at that time.

21       A.    Well, the neurological impairment was six

22  percent.

23       Q.    Okay.  And what was the basis of that

24  neurological impairment of six percent?

25       A.    Because he had discs, you know, the two major



 1  ones on the -- on the -- on a previous M.R.I. that was

 2  done at the time of his accident.

 3       Q.   Okay.

 4       A.   And he -- and it was at two levels, and

 5  there's a blanket number that you get for that from the

 6  Florida guides, and there was no other -- I didn't think

 7  the rest of his problems were from nerve encroachment so

 8  I didn't think it was -- anything more was -- was needed

 9  for that.

10       Q.   Taking the 18 percent that was assigned by the

11  orthopedic, did you combine the -- the two impairment

12  ratings to give an overall impairment rating from

13  neurological and orthopedic perspective --

14       A.   Yeah, there --

15            MR. MOWERS:  Object, objection and move to

16       strike, lack of foundation.

17            THE WITNESS:  There's a standard way to

18       combine them.  There's a little table at the end

19       and it's not quite adding it together because it

20       gets larger and larger numbers.  It's sort of

21       logarithmic, it gets more and more differences.

22  BY MR. COFFEY:

23       Q.   Let me --

24       A.   So you just look it up on the table and if the

25  guy has this and then you add this to this, you go the



1   opposite direction, you'll find the number where the two

2   intersect and you get a number from that which I think

3   was .3 but anybody can do that.  It's not a --

4       Q.   Okay.  What -- what table did you utilize to

5   combine the impairment ratings for Mr. Ore back in

6   August of 2013?  What --

7       A.   It's table of combining -- it's -- I know it's

8   at the very end of the -- at the very end of the book

9   because they -- it's like a general type of thing.  It's

10  the same table that the A.M.A. uses also.  It's usually

11  at the very end, where they want to tell you what to do,

12  if you have multiple impairments, how you put them

13  together if they are not related.

14  BY MR. COFFEY:

15      Q.   Is this a peer reviewed source, the impairment

16  rating guide?

17      A.   The state puts -- the state puts it out.  I

18  would hope that the state does it.  I'm not sure what

19  their -- how they came up with this.  It's a simplified

20  rating system from 1996.  That's when they last revised

21  it, but they came about that and that's what's used

22  in -- in these type of cases in Florida.

23      Q.   Is that a State of Florida rating guide book?

24      A.   Yes.  Yes.

25      Q.   Okay.  And is this the book used by all the



PAUL L. GINSBERG, M.D.                              March 22, 2017
ORE vs TRICAM INDUSTRIES                                      47

```
 1   other doctors, similar doctors, within your community
 2   doing this kind of work?
 3        A.   For this type of work, yes.
 4        Q.   Okay.  All right.  And do you have an opinion
 5   within a reasonable degree of medical probability what
 6   the combined impairment rating would be between
 7   neurological and orthopedic for Mr. Ore back in August
 8   21 of 2013?
 9             MR. MOWERS:  Objection.  Move to strike.
10             THE WITNESS:  Yeah, my opinion was 23 percent.
11   BY MR. COFFEY:
12        Q.   Okay.  Was he still suffering from
13   psychological or psychiatric issues?
14        A.   Yes, he was still depressed.
15        Q.   Okay.  Would that be within your impairment
16   rating or would that be additional assigned by a
17   psychologist or psychiatrist?
18        A.   That would be additional by the psychiatrist
19   or psychologist.
20        Q.   Okay.  Going forward from that time, did you
21   recommend that he continue occipital nerve blocks if you
22   believed it would help him?
23        A.   Yes.
24        Q.   Did he -- did Mr. Ore want to go see a
25   neurosurgeon at that time?
```



PAUL L. GINSBERG, M.D.                                      March 22, 2017
ORE vs TRICAM INDUSTRIES                                             48

1        A.   Somewhere along the way he did.  Whether it
2   was that date or not, I'm not sure.  I think --
3        Q.   Could you look at the note and see if --
4        A.   This is -- which note?  To look at the --
5        Q.   The same of August 2013.
6        A.   I don't see it in that note.  Sorry, maybe you
7   could point it out if you thought I wrote it.
8        Q.   May I borrow the note, please, from you?
9        A.   Yeah, sure, please do.
10       Q.   Thank you.  Keep moving.  Thank you.
11       A.   Okay.
12       Q.   All right.  You next see him when?
13       A.   It looks like October 9th, 2013.
14       Q.   And how was he doing at that time?  Anything
15  different?
16       A.   No.  It's just same, same type of problems.
17       Q.   Did you continue with injections for him?
18       A.   Yes.
19       Q.   Okay.  Just go through your notes, Doctor,
20  tell us the dates of the encounters --
21       A.   Okay.  I should be able to go quicker then.
22       Q.   -- and if there's anything significantly
23  different or if you performed injections again.
24       A.   Okay.  Sure.
25            I mentioned -- the only thing, this new



```
 1   symptom is not related to his accident.  He had some

 2   night sweats which is more of a medical thing.

 3             MR. MOWERS:  What note are we referring to?

 4             THE WITNESS:  The next note would be -- I'm

 5        sorry, I should say all the dates.  It looks like

 6        November 13th, both of 2013.  He started mentioning

 7        he's having night sweats which is a medical

 8        problem, not an injury problem, on -- in October

 9        and -- and -- and he continued to say he still had

10        them in -- in November.  He said November, it was

11        supposed to be more surgery but it was by the

12        orthopedist.

13             MR. MOWERS:  Is there a question pending?

14             MR. COFFEY:  I'm asking him to go through the

15        notes to speed it up to see what the next date

16        of encounters are.  Tell me --

17             THE WITNESS:  Okay.  I'll try to at this point

18        just list --

19             MR. MOWERS:  I would prefer that you ask a

20        question.

21             MR. COFFEY:  Well, I did ask a question and

22        we're not here to do what you prefer.  We're here

23        to conduct a deposition in accordance with the

24        Federal Rules of Civil Procedure.

25             MR. MOWERS:  Then conduct it.
```



```
 1              MR. COFFEY:  I am.

 2              THE WITNESS:  Shall I go on?

 3   BY MR. COFFEY:

 4        Q.   Tell us your next date of encounter, please.

 5        A.   Okay.  December 18th, 2013.

 6        Q.   Okay.  Anything significant from that event?

 7        A.   Again, not related to that problem, he had

 8   some high blood pressure.

 9        Q.   Okay.

10        A.   So I suggested he go to the emergency room.

11        Q.   All right.

12        A.   But he -- I -- I was, unfortunately, not sure

13   he would go -- go because of his expense --

14        Q.   Okay.

15        A.   -- and. . . .

16        Q.   Did you --

17        A.   Okay.  So wait, wait.  I -- let's see.  I gave

18   him some advice how he might be able to get some

19   insurance to get some medical care because he seemed to

20   really need it.

21              MR. MOWERS:  Move to strike.

22              THE WITNESS:  That's all on that.

23              MR. COFFEY:  Excuse me, I agree to your motion

24        to strike.

25              THE WITNESS:  Okay.
```



1   BY MR. COFFEY:

2        Q.   Doctor, we're trying not to talk about

3   insurance in your testimony today.

4        A.   Oh, okay.  I'm sorry.  Yeah, I'm sorry.  Okay.

5        Q.   I think that was the subject of the motion to

6   strike --

7        A.   Yes.

8        Q.   -- and I agree to defense counsel's motion to

9   strike.

10       A.   Okay.

11       Q.   Anything --

12       A.   Should I -- should I mention anything related

13  to any medical problems, or should I leave them out

14  then, because I -- I -- as a doctor treating him, I -- I

15  noted them --

16       Q.   Yes, sir.

17       A.   -- but I wasn't authorized to do anything

18  about those.

19       Q.   We're trying to keep the issue of insurance

20  out of the case and we agreed to that so --

21       A.   Should I leave all medical problems out then

22  because they are not really relevant to this problem?

23       Q.   Well --

24       A.   Please tell me what I should do about it.

25       Q.   -- I don't have a problem with you including



 1  medical problems because defense counsel, he may

 2  cross-examine, ask questions about that certainly, but

 3  we're not going to ask you about health insurance or

 4  lack of health insurance.

 5      A.   Okay.  All right.

 6      Q.   Did you perform injections in December of

 7  2013?

 8      A.   Yes, yes.

 9      Q.   Okay.  And what --

10      A.   Yeah, almost every visit was with injections.

11      Q.   What's the next time you saw him?

12      A.   He came back in January 22nd, 2013.

13      Q.   Did you perform injections again at that time?

14      A.   Yes.

15      Q.   Anything else significant or new related to

16  the accident?

17      A.   I know he came with a case manager.  It was

18  the -- I thought -- it was a question of restrictions

19  and I said refer to the orthopedist.

20      Q.   Okay.  And when's the next time you saw him?

21      A.   All right.  I saw him 2/26/14, just injections

22  at that time.

23      Q.   Okay.  Next visit?  By the way, were you

24  continuing him on the hydrocodone on these visits to --

25      A.   At some point he was -- I believe he started





 1  to see a Dr. Vendryes.  He's a pain management guy who

 2  started giving him narcotics.

 3       Q.   All right.  Let's go to your next visit, '14.

 4       A.   That would be another '14 visit.  Hold on.

 5       Q.   You may need your computer on this one,

 6  Doctor.

 7       A.   Yes.  Thank you.

 8       Q.   Bless you.

 9       A.   Okay.  This is -- let's get this date and I'll

10  go from there.  2/26/14.

11            Yes, there was a visit on -- It must be past

12  that -- may -- May 7th of 2014.

13       Q.   Okay.

14       A.   And that one --

15       Q.   Are these for injections again?

16       A.   Yes.  Let me just make absolutely sure it was.

17  He -- by that time he had, by the way, the second

18  surgery, was -- it was after that second surgery.

19       Q.   For the shoulder?

20       A.   I believe so.

21       Q.   Okay.

22       A.   And that's all I see in my notes.  He comes

23  back --

24       Q.   Were you really just following him now for the

25  headaches and the injections --



1      A.   He said -- yeah.  He said that's the only

2  thing that seemed to help his headaches.  He -- he

3  didn't want to take narcotics or other things for

4  headaches, which is usually admirable, and this is a

5  pretty simple benign procedure.

6      Q.   Okay.

7      A.   And 6/18/14, he was back again and that should

8  have been same time.

9      Q.   Okay.

10      A.   He had a couple other symptoms but, again, I

11  didn't think they were related, like some numbness to

12  the right face.  That's the time he said, by the way, he

13  wanted a neurosurgical evaluation --

14      Q.   Okay.

15      A.   -- I mentioned before.  And he mentioned

16  Dr. Pasarin.  I know he works -- I met him only a couple

17  times.  He's a -- Pasarin, he's a neurosurgeon I know

18  that is connected with Tenet.

19          And then I had done a little exam at that

20  visit because of his numbness but I didn't find anything

21  objective.

22      Q.   Okay.

23      A.   All right.  I did recommend an E.E.G. just in

24  case because he had head trauma that wasn't a seizure

25  related to it.



Q. Did he go get that E.E.G. and --
A. It was done on 6/25.
Q. Any significance to the results, anything positive?
A. No.
Q. Okay. When do you see him next?
A. 7/30 he comes back.
Q. Anything different that he did or you found?
A. No. He still had his -- his -- same neurological symptoms as before. The surgery. I hoped they would go away but they did not, but there was actually -- he -- I -- I pinpoint -- had him pinpoint how often the headaches were occurring. He said like every four days now so actually there had been a little bit of improvement in that too from the shots, so that's why he felt they were helpful.
Q. Okay.
A. Okay. And the next visit is 8/27.
Q. Tell us what occurred at the August 27th, 2014, encounter that's different, if anything.
A. So far it looks like nothing different. I can summarize that easily. Let me --
Q. Did you perform injections on that date?
A. Yes.
Q. Okay. You talked to our expert life care

1    planner and vocationalist, Ira Morris, it looks like, on

2    September 10 of 2014.

3            Did you create a note for that?

4       A.   Prob -- usually I don't when I do that type of

5    thing.

6       Q.   I'm going to share with you page 21 of his

7    report and there's a paragraph with a reference to you

8    and that date on it.  Do you see it?

9       A.   Yes.

10      Q.   Okay.  All right.  There's certain

11   recommendations that you made to Mr. Morris at that

12   time.  Is that correct?

13      A.   Yes.

14      Q.   Okay.  Can you tell us what you were

15   recommending back at that time, August -- I'm sorry,

16   September 10, 2014, about future care for Mr. Ore from

17   the neurological perspective within a reasonable degree

18   of medical probability.

19      A.   Yes.  I thought that since he said the

20   headaches were -- were continuing and he was getting

21   relief and it was relatively expensive and very --

22   and -- and effective treatment for him, that he wants --

23   that he probably would want to keep coming back for the

24   shots indefinitely.

25      Q.   Okay.  And which -- what injections are these,



PAUL L. GINSBERG, M.D.                                    March 22, 2017
ORE vs TRICAM INDUSTRIES                                              57

1   what medications?

2        A.   I use a bupivacaine and -- that's the main

3   ingredient -- that's actually the one we use recently --

4   and with adding another ingredient before which is

5   temporarily off the market called Sarapin.

6        Q.   Okay.  And how often were you recommending

7   those for the future up to life expectancy?

8        A.   Well, at the time he was coming back once a

9   month, so I gave him one month's worth.

10       Q.   Okay.  Do you have an opinion whether or not,

11   within a reasonable degree of medical probability, the

12   frequency that Mr. Ore would -- may require these shots

13   in the future as to life expectancy?

14       A.   At the time I thought it would be once a --

15   once a month.

16       Q.   Okay.  Are there other recommendations for

17   medical management or from the neurological perspective

18   for Mr. Ore related to the accident as to life

19   expectancy that you --

20       A.   Well, since I was giving him the -- some

21   sertraline and Trazodone, two medications, sertraline

22   the antidepressant, Trazodone to help him sleep and also

23   it's an antidepressant, that he probably should continue

24   on that.

25       Q.   Okay.  Any other recommendations?



PAUL L. GINSBERG, M.D.                                March 22, 2017
ORE vs TRICAM INDUSTRIES                                            58

1          A.   I probably -- I repeat he was at M.M.I. and

2     that he had just -- he'd do better at handling -- not --

3     avoiding a stressful environment because -- since he's

4     had problems with his blood pressure being up on several

5     visits.

6          Q.   Did you believe that he could go back to work

7     in some capacity at that time from a neurological

8     perspective?

9          A.   Yes.

10         Q.   Tell us that opinion, please, within a

11    reasonable degree of medical probability.

12         A.   I said that he -- as long as he -- it was not

13    a stressful environment and, you know, he could handle,

14    obviously, with his right arm, which I'll defer the

15    exact amount to the orthopedist, that he could -- he

16    could end back -- he could go back to work at that

17    point, do any certain job of that -- that sort.

18         Q.   With respect to orthopedics, did you defer to

19    the orthopedist?

20         A.   Yes.

21         Q.   With respect to neuropsychology issues, would

22    you -- did you defer to the neuropsychologist?

23         A.   Yes.

24         Q.   With respect to any kind of ophthalmic issues,

25    eye issues, did you defer to the ophthalmologist,



PAUL L. GINSBERG, M.D.                                    March 22, 2017
ORE vs TRICAM INDUSTRIES                                              59

```
 1   Dr. Ciliberti?
 2        A.   Yes.
 3        Q.   And with respect to anything neurosurgical,
 4   did you defer to any neurosurgeons that were following
 5   him?
 6        A.   I just recommended he should see him.  I
 7   didn't know if he had seen a neurosurgeon then.
 8        Q.   Okay.  All right.
 9        A.   But if he wanted a neurosurgical opinion, it's
10   certainly reasonable.
11        Q.   Could I borrow that page back.
12             Let's fast forward from that time, Doctor,
13   September 2014, until the time that Mr. Ore undergoes or
14   suffers stroke.
15             Just globally, did anything really change with
16   respect to the --
17        A.   No.
18        Q.   -- care of Mr. Ore?
19        A.   No.
20        Q.   Okay.  Was he coming back periodically for the
21   injections that --
22        A.   Yes.
23        Q.   -- you recommended?
24        A.   Yes.
25        Q.   Okay.  And you understand that he would have
```



PAUL L. GINSBERG, M.D.                                   March 22, 2017
ORE vs TRICAM INDUSTRIES                                            60

```
 1   continued his medications that you had recommended back
 2   then?
 3        A.   Yes.
 4        Q.   Okay.  Back at the time that you talked to our
 5   expert, you had the opinion that Mr. Ore could work in
 6   some capacity.  Is that true?
 7        A.   Yes.
 8        Q.   Okay.  Since the stroke, have you continued to
 9   follow him for the work-related injury?
10        A.   Yes.
11        Q.   Okay.  All right.  You're aware of his other
12   medical conditions because he's your patient --
13        A.   Yes.
14        Q.   -- the stroke and such.  Correct?
15        A.   Yes.
16        Q.   Okay.  Do you have an opinion, Doctor, within
17   a reasonable degree of medical probability whether or
18   not Mr. Ore is capable of working at all since the
19   stroke and the recovery up to present?
20        A.   Based on what I've seen of him and -- I don't
21   think he can work, do anything.  His -- his biggest
22   problem is visual.  He had -- he had other problems
23   which he actually made an excellent rehabilitation
24   effort through.  He's doing much better, but he's --
25   he's left with a dense, what's called, field cut.  I'm
```



PAUL L. GINSBERG, M.D.                                    March 22, 2017
ORE vs TRICAM INDUSTRIES                                            61

 1   trying to remember which side.  I think it's on the

 2   right side.

 3            And that field cut means that he can't follow

 4   sentences.  It's very hard to read when you have a field

 5   cut, because he -- you can go so far but you can't find

 6   the rest of the words.  You have to learn to read over

 7   it.  Some people, it slows you down tremendously.  And

 8   it means you can't see things off to the right so you

 9   can't drive, you can't drive around because you can't --

10   you can't drive a forklift or anything like that or a

11   car because you're going to have an accident, you can't

12   see things coming up from one side.

13        Q.   Has -- has the stroke and the other problems

14   that he suffered in the fall of 2015 exacerbated or made

15   worse the problems that you were treating him for with

16   respect to the -- the fall from the ladder?

17        A.   No, it's a separate problem.

18        Q.   Okay.  Does he continue to have the problems

19   that you were treating him for before the stroke up to

20   the present time?

21        A.   Yes.  He still has the basic headaches.

22        Q.   Do you continue to treatment him for

23   headaches?

24        A.   Yes.  I think he comes every two months now.

25        Q.   Okay.  And what are you doing for treatment



PAUL L. GINSBERG, M.D.                                        March 22, 2017
ORE vs TRICAM INDUSTRIES                                                62

1  now for --

2       A.   The same, since he found the shots were

3  useful.  It's a very benign medication.  Using just a

4  local anesthetic, I just give him that.

5       Q.   The opinions that you gave back in September

6  of 2014 about the need for future medical care in terms

7  of injections, the sertraline, the Trazodone, and the

8  hydrocodone, do those still opinions -- do they still

9  hold for Mr. Ore presently in going forward as to life

10 expectancy related to the ladder accident in your

11 opinion, Doctor, within a reasonable degree of medical

12 probability?

13      A.   They shouldn't change because of the stroke or

14 anything.  They should be -- he's about the same.

15      Q.   Do you foresee in the future of Mr. Ore

16 getting better from the stroke and being able to go back

17 to work in any kind of capacity?

18      A.   I think he's reached -- well, again,

19 unofficially, I believe he has reached maximum medical

20 improvement from the stroke too.  It's been probably a

21 year and a half or something like that, two years --

22      Q.   Yes, sir.

23      A.   -- if -- if my estimate is correct, and he --

24 and he -- as I said, he -- the motor thinks he did a

25 very good improvement on because he can -- you can



1    teach new -- you can relearn those types of skills, and

2    speech, also, you can practice, you can get much better.

3    That all got much better.  But a field cut, there's no

4    way to get other brain tissue to take over the function

5    of that side of the brain.

6         Q.   Yes, sir.  Do you think that Mr. Ore will ever

7    go back to driving since the stroke?

8         A.   I hope not.

9         Q.   Okay.

10        A.   He really is not safe to drive.

11        Q.   Was he able to drive after the fall from the

12   ladder but before the stroke after he recovered?

13        A.   Yes.

14        Q.   Are there any other opinions or changes that

15   we haven't talked about here today related to the fall

16   from the ladder that you hold that we should be

17   exploring with you?

18        A.   I don't know what you should be exploring.

19   I've given --

20        Q.   I'm not sure if I missed something that's

21   major.

22        A.   No, not really.  I think we've covered the

23   major things.

24        Q.   Does Mr. Ore continue to be your patient to

25   treat for the ladder accidents?



PAUL L. GINSBERG, M.D.                                    March 22, 2017
ORE vs TRICAM INDUSTRIES                                              64

1        A.    Yes.

2        Q.    Okay.  Do you believe that he's going to need

3    to see a neurologist for the rest of his life with

4    respect to the ladder accident on a -- on a regular

5    basis?

6        A.    As long as he finds those shots are helpful,

7    I'm happy to do it so, yes.  He might not need them as

8    often.  As I said, he seems to be happy enough for two

9    months now so he has improved a little bit as far as

10   that goes.

11       Q.    Okay.  There are costing items, costs on this

12   page from Dr. -- or from Mr. Morris's report.

13             Do you know where those costs came from?

14       A.    It has to from the office that charges it.  I

15   don't personally --

16       Q.    What were the costs back in 2014 of each

17   intervention?  So just tell us an intervention, tell us

18   the cost --

19       A.    The shots cost $148.

20       Q.    Okay.

21       A.    If it's a visit, it's somewhere between 96 and

22   189 depending on how much time we spent.

23       Q.    Okay.

24       A.    That's the whole cost.

25       Q.    How about the medications --



PAUL L. GINSBERG, M.D.                                      March 22, 2017
ORE vs TRICAM INDUSTRIES                                              65

 1          A.    Medication, with that included -- actually,

 2     that's included in that last --

 3          Q.    Okay.

 4          A.    -- it says it was 96 to 189.

 5          Q.    Yes, sir.

 6          A.    The medicines aren't very expensive by

 7     themselves but the visits -- the visits are a moderate

 8     level visit.  He needs them only once in a while.  It

 9     wouldn't be every month --

10          Q.    Are these --

11          A.    -- in my opinion.

12          Q.    -- are these recommendations reasonable in

13     your opinion, Doctor?

14          A.    Yes.

15          Q.    Okay.  Are these recommendations related to

16     the injury and the fall from the ladder, Doctor?

17          A.    Yes.

18          Q.    Are these recommendations consistent with what

19     other doctors within your specialty would recommend

20     within the local medical community?

21          A.    Yes.

22          Q.    Are these recommendations necessary for

23     Mr. Ore to treat the injuries that he sustained in the

24     ladder fall accident?

25          A.    Yes.



1       Q.   Okay.  Have all the opinions you've given here

2   today, Doctor, been within a reasonable degree of

3   medical probability?

4       A.   Yes.

5            MR. COFFEY:  Okay.  Thanks.  I have no further

6       questions.  I think defense counsel probably has

7       many for you though.  Thank you.

8            THE WITNESS:  Okay.

9         CROSS-EXAMINATION (PAUL L. GINSBERG, M.D.)

10  BY MR. MOWERS:

11      Q.   Good afternoon, Doctor.

12      A.   Hello.

13      Q.   Let me introduce myself to you.  My name is

14  Jeffrey Mowers and I represent the defendants in this

15  case, Tricam Industries and Home Depot.  I have some

16  questions for you --

17      A.   Sure.

18      Q.   -- please.

19           Now, all of the treatment that you have given

20  to Mr. Ore in this case relating to the ladder accident

21  fall under Workers' Compensation.  Correct?

22      A.   Yes.

23      Q.   And you're an authorized doctor under Workers'

24  Compensation?

25      A.   Yes.



PAUL L. GINSBERG, M.D.                                    March 22, 2017
ORE vs TRICAM INDUSTRIES                                            67

1        Q.   And when you first saw the plaintiff on

2   April 25, 2012, that was through Workers' Compensation?

3        A.   Yes.

4        Q.   And during the course of seeing him over the

5   past, approximately, five years, up and -- up through

6   the last date that you saw him which, excuse me, I

7   believe you said was on February 1st, 2017, that was all

8   through Workers' Compensation.  Correct?

9        A.   Yes.

10       Q.   Now, based upon questions that Counsel asked

11  you, he touched on some of the conditions that the

12  plaintiff is suffering from now that are unrelated to

13  his Workers' Compensation accident.  Correct?

14       A.   Yes.

15       Q.   One of them is the stroke event that he had.

16  Isn't that true?

17       A.   Yes.

18       Q.   Now, is it your understanding that in late

19  August of 2015 during the time that you were following

20  the plaintiff, that -- that he had sustained or had a

21  multiple-stroke event?

22       A.   I think I saw that, yeah, yes.  I don't know

23  if it's multiple or one but I know he had a stroke.

24       Q.   Right.  And that was in late August of 2015.

25  Correct?



1        A.    Sounds about right, yes.

2        Q.    And he was hospitalized extensively for that,

3   wasn't he?

4        A.    Yes.

5        Q.    And you actually saw him during the course of

6   his hospitalization?

7        A.    I don't remember if I actually saw him

8   formally then.  He was at -- he was at -- for rehab, he

9   was at Memorial South.  I do go there but I don't

10  remember -- I don't know if I just said hello to him at

11  the time because I know him, you know, just as a social

12  visit over there or what, I just don't remember.

13       Q.    So --

14       A.    He -- he was -- I knew him for quite a while.

15  In fact, his picture is still up on the elevator in the

16  rehab department.

17       Q.    So he was -- he was hospitalized for his

18  strokes back in late August of 2015 and then, as I

19  understand your testimony, he then went into some

20  rehabil -- rehabilitation?

21       A.    Yes.

22       Q.    And that was extensive as well?

23       A.    Yes.

24       Q.    Since August of 2015, hasn't the plaintiff

25  also sustained mult -- multiple seizures requiring



1  hospitalization and treatment?

2      A.   I'm not really following him on that.  That's

3  probably more related to his stroke.  That probably -- I

4  think I do remember him mentioning that but --

5      Q.   Are you saying that the -- the seizure events

6  that are identified and described in the medical records

7  relate back to his strokes?

8          MR. COFFEY:  Lack of predicate.

9          THE WITNESS:  I think so because right there

10     you have a real brain injury.  Usually, a

11     concussion, the type of injury he had before,

12     shouldn't cause seizures.

13  BY MR. MOWERS:

14     Q.   Right.

15     A.   Usually, with concussions they have to be like

16  a penetrating injury or a more major injury.  This one

17  didn't have it so I believe his stroke probably caused

18  subsequent seizures.

19     Q.   Right.  Well, we'll get into the -- the

20  concussion.  I believe you -- you testified earlier that

21  you thought that the plaintiff had a concussion from

22  his --

23     A.   Yeah.

24     Q.   -- fall from the ladder.  Correct?

25     A.   Yeah.



PAUL L. GINSBERG, M.D.                                     March 22, 2017
ORE vs TRICAM INDUSTRIES                                            70

1        Q.    And -- and based upon questions from Counsel,

2   I believe you said that by January 2013 he was no longer

3   suffering from that concussion.  Is --

4        A.    Yeah.

5        Q.    -- that a fair statement?

6        A.    Yes, I think that's fair.

7        Q.    Okay.  So these seizures that are described in

8   the medical records after his stroke in August of 2015,

9   they are related to his stroke event.  Correct?

10       A.    In my opinion, yes.

11       Q.    And although you were not specifically

12  treating him for the stroke and for the seizures, when

13  you would see him as part of his Workers' Comp accident,

14  he -- you did discuss those conditions with him.

15  Correct?

16       A.    He would to some -- again, not -- not in

17  detail because I wasn't supposed to see him for that and

18  he had a neurologist at the -- from Memorial who was

19  seeing him for that.

20       Q.    When you say that you were not supposed to see

21  him for that, is it -- is it the case that you were not

22  authorized to treat him for conditions that were not

23  related to his accident?

24       A.    That's correct.

25       Q.    And the stroke and the seizures were not



PAUL L. GINSBERG, M.D.                                    March 22, 2017
ORE vs TRICAM INDUSTRIES                                                71

1  related to his accident.  Correct?

2        A.    That's correct.

3        Q.    Is that true?

4        A.    That's correct.

5        Q.    Now, the plaintiff has -- has been left with

6  permanent physical limitations and cognitive limitations

7  because of these seizures and strokes.  Isn't that true?

8        A.    More the strokes than cognitive seizures.

9        Q.    Okay.  Is he -- is he left with a permanent

10 numbness and weakness on his right side from these

11 strokes?

12       A.    That recovered well.  I would defer to his

13 treating neurologist for that.  I don't usually -- most

14 of the time I see him, just start talking, give him

15 shots and that's about it.  So I'd have to defer to him.

16 I -- I know his movements, I've observed him, are very

17 good on the right side now so it came back.  Close -- if

18 it's not normal, it's close to normal.

19       Q.    Was there a period of time after he -- the

20 stroke event that Mr. Ore, plaintiff in this case,

21 experienced numbness and weakness on the right side --

22       A.    Yes.

23       Q.    -- which was related to his stroke?

24       A.    Yes.

25       Q.    Obviously, that's not related to his fall off



```
 1   the ladder.  Correct?
 2        A.   Correct.  That's correct.
 3        Q.   The seizures and strokes have also resulted in
 4   problems with his vision.  Correct?
 5        A.   Yes.
 6        Q.   I don't know whether you described it
 7   specifically, counsel asked you, but is he left with a
 8   right peripheral vision loss?
 9        A.   Yes.
10        Q.   And that's from the stroke?
11        A.   Yes.
12        Q.   That has nothing to do from the fall off the
13   ladder.  Correct?
14        A.   That's correct.
15        Q.   And is that the reason why you recommended he
16   should not be driving?
17        A.   Yes.
18        Q.   Now -- now, isn't it true that the seizures
19   and strokes that you've described have resulted in the
20   plaintiff having slurred speech and difficulty
21   formulating words?
22        A.   That's largely gotten better too.  When I saw
23   him initially, I heard he had a stroke, he did have a
24   sort of hesitant type of speech, but over time that has
25   really gotten much better so, again, I -- the extent
```



 1  that I talk to him now, his speech is grossly normal.

 2      Q.   All right.  But did you actually document the

 3  fact that after he had these strokes and seizures, that

 4  he was slurring his speech and having difficulty

 5  formulating words --

 6      A.   Yeah, it's in my earlier notes.  After the

 7  stroke, yes, he did at that time, yes.

 8      Q.   Okay.  If you could, Doctor, would you turn to

 9  your office note for February 17th, 2016.

10      A.   Okay.  February 16.

11      Q.   February 17th, 2016.

12      A.   Yes.

13      Q.   Do you have that there in front of you?

14      A.   I have it here.  If not --

15      Q.   And you're going to get it in paper?

16      A.   Yes.

17      Q.   You have it in front of you?

18      A.   Yes.

19      Q.   All right.  I have some questions for you

20  specifically about that note.

21           Now, you -- you noted on that date that the

22  primary problem relating to the fall from the ladder

23  related to the plaintiff's right shoulder.  Correct?

24      A.   Yes.

25      Q.   That was the main source of his complaints?



PAUL L. GINSBERG, M.D.                                    March 22, 2017
ORE vs TRICAM INDUSTRIES                                          74

1        A.    Yes.

2        Q.    And that's why he was coming to you for these

3    trigger point injections?

4        A.    Yes, because they were causing him secondary

5    headaches.

6        Q.    Right.  So these headaches really relate to

7    his shoulder.  Is that true?

8        A.    That's correct.  I -- I believe the shoulder

9    is the main injury.

10       Q.    Okay.  The headaches aren't related to any

11   kind of a cervical injury?

12       A.    It's -- it's a small proportion of his pain.

13       Q.    Okay.

14       A.    I think the majority of his pain is from his

15   shoulder.

16       Q.    Right.  I mean, you state on 2/17/16 the

17   primary injury he had was to his right shoulder.

18   Correct?

19       A.    That's exactly what I'm trying to say.  It's

20   the primary injury.

21       Q.    Okay.  So on that date, though, you were able

22   to -- to discuss with him some of the problems he was

23   having relating to his stroke.  Correct?

24       A.    Yes.

25       Q.    His strokes.  Actually strokes plural.



1  Correct?  He had more than one stroke?

2       A.   I cannot remember that because I wasn't seeing

3  that in detail, but. . . .

4       Q.   Okay.  I'm just looking at your note and it --

5  it says that you've given him some emergency supplies

6  for medications and problems related to the stroke.

7       A.   Yeah.

8       Q.   You see that?

9       A.   Yes.

10      Q.   What -- what medications and supplies did you

11 give him?

12      A.   I think he told me what they had given him

13 over in the hospital and I just made sure he had enough

14 to -- the day he said he was going to get to see the --

15 his doctors over in the clinic.

16           I believe amlodipine, a blood pressure pill,

17 from what I can tell over here, and the piracetam.  I

18 didn't want him to have a seizure waiting for a visit.

19 A lipid drug, simvastatin.  Those are the three, I

20 believe, I added.  I thought those were -- were

21 dangerous to let him go, and just because he had a delay

22 so I -- I stepped out a little bit, tried on an

23 emergency basis.

24      Q.   And as a neurologist practicing for many, many

25 years in South Florida, you've treated many stroke



PAUL L. GINSBERG, M.D.                                    March 22, 2017
ORE vs TRICAM INDUSTRIES                                            76

1  patients.  Correct?

2       A.   Yes.

3       Q.   Now, you note on this 2/17/16 office note that

4  plaintiff is having problems from his stroke with some

5  aphasia, a-p-h-a-s-i-a.

6       A.   Yes.  That means speech problems.

7       Q.   Okay.  Is that slurred speech?

8       A.   Slurred, also word-finding problems, not just

9  slurred.

10      Q.   Okay.  You also note he's having a problem

11 with right field cut.

12      A.   That means a peripheral vision problem as you

13 put it before.

14      Q.   Is that -- is that related to a organic brain

15 injury?

16      A.   Stroke.

17      Q.   From a stroke?

18      A.   Yes.

19      Q.   But that's -- that's pro -- that's a problem

20 in his brain?

21      A.   Yes.

22      Q.   And you also note that he has right

23 hemiparesis.

24      A.   Yes.

25      Q.   What is that?



PAUL L. GINSBERG, M.D.                                    March 22, 2017
ORE vs TRICAM INDUSTRIES                                            77

1        A.    That means he's a little weak on the right

2    side.

3        Q.    Is that like -- is that partial paralysis?

4        A.    Yes.

5        Q.    And that's on the right side?

6        A.    Yes.

7        Q.    And that's all related to his strokes?

8        A.    Yes.

9        Q.    Are you also aware that since late August of

10   2015 that he was diagnosed with a -- a vascular an --

11   aneurysm?

12       A.    I didn't remember that until you mentioned it

13   now.

14       Q.    Okay.  Is that something you -- did I -- does

15   that refresh your recollection mentioning that, that he

16   was diagnosed with that condition?

17       A.    To be honest, no, I actually don't recall it.

18   I wouldn't be surprised but if they -- when they do a

19   workup, they often find things incidentally.

20       Q.    Did he tell you incidentally they also found

21   that he had a heart condition known as P.F.O.?

22       A.    I think he mentioned that.

23       Q.    Okay.  And was he treated for that?

24       A.    I believe so, yeah.

25       Q.    And -- and that's not related to his ladder



PAUL L. GINSBERG, M.D.                                    March 22, 2017
ORE vs TRICAM INDUSTRIES                                              78

1   accident.  Correct?

2       A.   No, that's related to the stroke.

3       Q.   Okay.  Now, these strokes and seizures and

4   other events that he's had since late August 2015 are

5   all serious medical -- medical conditions.  Correct?

6       A.   Yes.

7       Q.   And they're potentially life threatening,

8   aren't they?

9       A.   Yes.

10      Q.   And none of those conditions are related to

11  his fall from the ladder.  Isn't that true?

12      A.   That's correct.

13      Q.   And is it your opinion today based upon how he

14  is from the strokes, the seizures and the other

15  unrelated problems that have nothing to do with the

16  ladder accident, that he's not capable of working?

17      A.   That's correct.

18      Q.   But it was your opinion before late August of

19  2015 that he was capable of returning to work?

20      A.   That's correct.

21      Q.   In a full-time capacity.  Correct?

22      A.   Yes.

23      Q.   And, in fact, he -- he had returned to work

24  for a period of time, hadn't he?

25      A.   I believe so, yeah.



PAUL L. GINSBERG, M.D.                                    March 22, 2017
ORE vs TRICAM INDUSTRIES                                              79

1      Q.   And do you know whether he had a job that

2   required intensive labor?

3      A.   I think he was a supervisor of some sort, if I

4   remember.  He said something about forklift but I don't

5   remember much else what --

6      Q.   And your understanding was that he was a

7   supervisor at a Tire Kingdom?

8      A.   Yes, yes.

9      Q.   Okay.  And your opinion that he was able to

10  return to work, was -- was that in his capacity as a

11  Tire Kingdom supervisor?

12     A.   Yes.

13     Q.   And as far as you were concerned, from a

14  neurologic standpoint, he could return to that job.

15  Isn't that correct?

16     A.   Yes.

17     Q.   Now, your records refer to lots of other

18  medical conditions that you notated which I don't

19  believe are related to his fall from the ladder.  As an

20  example, could you -- could you turn to your note of

21  August 5th, 2015, please.

22     A.   Yes.

23     Q.   Okay.  In -- in that note, you make reference

24  to the fact that he has hypertension which is high blood

25  pressure.  Correct?



1     A.   Yes.

2     Q.   And you had -- you had previously testified in

3  response to questions from Counsel that at one point

4  he -- his blood pressure had gone through the roof.

5  Correct?

6     A.   Yes.

7     Q.   Okay.  And -- and that certainly was not

8  related to the -- the fall from the ladder.  Isn't that

9  true?

10     A.   That's correct.

11     Q.   You also note in this August 5th, 2015, that

12  he's having issues with sleep apnea.  Correct?

13     A.    I thought he could have it.  I didn't -- he

14  didn't -- you'd have to have a study to diagnose that

15  completely.  He had a pattern -- because he had gained

16  weight and he was snoring at night and he had some

17  sleepiness, I thought that was a triad that makes you

18  think of sleep apnea.

19     Q.   Right.

20     A.   So it didn't mean he had it until you do a

21  study to show he has it.

22     Q.   Were you prescribing one of those

23  antidepressants for him because of his sleep issues?

24     A.   Yeah.  The -- the Trazodone is usually used --

25  it's not used much as an antidepressant anymore but they



```
 1    use it a lot as a sleep -- as a sleep drug.
 2         Q.   Okay.  So any sleep deprivation issues that
 3    you thought he might have, that had nothing to do with
 4    the fall from the ladder.  Correct?
 5         A.   No, that's medical.  That's medical.
 6         Q.   Right.  Okay.
 7              Now, you've testified repeatedly on direct
 8    examination about renewing prescriptions for Trazodone
 9    which is an antidepressant.  Correct?
10         A.   Yes.
11         Q.   But you -- you prescribed it for sleep?
12         A.   That's right, because he had insomnia.
13         Q.   Okay.  And you also --
14         A.   Insomnia, by the way, could relate to -- you
15    know, if you have pain, you can't sleep, so that's --
16    that's probably -- that's why I thought it was related
17    enough to actually prescribe it.
18         Q.   I see.  So you're saying it may -- it may have
19    been pain related but also he was having unrelated
20    difficultly sleeping?
21         A.   Right.
22         Q.   You also prescribed for him over time
23    sertraline?
24         A.   That was the antidepressant we mentioned over
25    time.
```



 1          Q.    All right.  Now, did he ever tell you,
 2    Doctor -- strike that.
 3              Was it your belief, as his treating
 4    neurologist, that the man was depressed?
 5          A.    Yes.
 6          Q.    Okay.  And -- and did he ever tell you during
 7    any time that you were seeing him, that he had a history
 8    of depression before he fell from the ladder in the --
 9    the late -- the date of the ladder accident being
10    April 6, 2012?
11          A.    I don't remember that.  I really --
12          Q.    Okay.  You don't -- you can't state whether or
13    not he -- he had been treated for depression and treated
14    for anxiety and was taking antidepressants before his
15    fall from the ladder?
16          A.    Not exactly.  I think one of my notes
17    certainly indicates he had been on it once before,
18    sertraline --
19          Q.    Okay.
20          A.    -- so that's why I may have picked that one
21    because I knew he could tolerate it and it was
22    inexpensive.
23          Q.    Is Lexapro an antidepressant?
24          A.    Yes.
25          Q.    Did he ever tell you he was taking Lexapro



PAUL L. GINSBERG, M.D.                                          March 22, 2017
ORE vs TRICAM INDUSTRIES                                              83

 1  before he fell from the ladder?

 2      A.   I have no recollection of that.

 3      Q.   Could you please turn to your note of May 27,

 4  2015, Doctor.

 5      A.   It should be right before that.  I'll go to

 6  back here.  You said 2015.  Right?

 7      Q.   Yes, May 27, 2015.

 8      A.   Got it.  All right.

 9      Q.   And are you able to read from your computer on

10  that?

11      A.   Yes.

12      Q.   All right.  At that time, did he express to

13  you concern about psychiatric illness?

14      A.   Yes.

15      Q.   And what did he tell you?

16      A.   He thought he was depressed, that -- he said,

17  admits he's depressed.  At that time he thought it was

18  from -- because he was -- he was scared he might be

19  bipolar because his mother had that.  That's what he was

20  concerned about.

21      Q.   All right.  And be -- because of that, was it

22  your recommendation or belief that he should see

23  somebody for that?

24      A.   Yes.  We mentioned that before, he probably

25  should see a psychologist --



PAUL L. GINSBERG, M.D.                                      March 22, 2017
ORE vs TRICAM INDUSTRIES                                              84

1        Q.    Right.

2        A.    -- or a psychiatrist.

3        Q.    Did you -- did you tell him that bipolar was a

4    serious problem that could require long-term psychiatric

5    management?

6        A.    Probably, but I don't know if I wrote it down.

7    Yeah, I suggested that -- that the psychologist might --

8    he should discuss it with the psychologist at the time

9    since he was having someone who evaluated him and he was

10   claiming he wasn't speaking well, but it was hard to

11   pick up anything definitely when he came to the office

12   so I thought that he should talk with her, maybe he

13   should see -- talk with her much more extensively than

14   me and see if she saw a difference.

15       Q.    And when he was relating to you that he was

16   having difficulty finding words, you -- you -- you did

17   not believe that was related to the fall from the

18   ladder.  Correct?

19       A.    That's correct, yeah, exactly.  I did not

20   think so.

21       Q.    You thought that that was subjective?

22       A.    At the time, it seemed more subjective

23   besides --

24       Q.    There was no objective reason for --

25       A.    When he talked to me, it wasn't obvious then



 1  to be expanded, so the question was, is it -- was it

 2  really a speech change or not.  I -- I wasn't convinced

 3  but I thought the neuropsychologist who would be

 4  measuring the linguistic function would be able to

 5  comment on that better than me.

 6       Q.   Okay.  So let's talk about the ladder

 7  accident.

 8            You -- you testified earlier that the first

 9  time you saw this gentleman was on April 25th, 2012.  Is

10  that correct?

11       A.   Yes.

12       Q.   If you could turn to that note for me, please.

13       A.   Yes, I have that.

14       Q.   Now, you told Counsel on direct examination

15  that the plaintiff told you that he had fallen off of a

16  ladder on April 6, 2012, from a height of about 12 feet.

17  Isn't --

18       A.   Yes.

19       Q.   -- that true?

20       A.   Yes.

21       Q.   That was his description, wasn't it?

22       A.   Yes.

23       Q.   And he told you that based upon his estimation

24  he had lost consciousness for a few minutes.  Correct?

25       A.   Yes.



PAUL L. GINSBERG, M.D.                           March 22, 2017
ORE vs TRICAM INDUSTRIES                                      86

1       Q.   By the way, if there's -- if there's a

2   indication or a record anywhere in your notes that he

3   was unconscious for 30 minutes after this accident, that

4   would be incorrect, wouldn't it?

5       A.   That's what I -- again, that's what I wrote

6   down initially.  That's all I can tell you.

7       Q.   Right.  On the very --

8       A.   It would be -- it would -- you know, if it was

9   a hospital note that documented it, I would defer to

10  that because they saw him right acutely at the time and

11  they could have better -- they have better data.

12      Q.   Well --

13      A.   I just wanted -- again, he -- I just knew it

14  was -- it seemed to me -- he said only a few minutes, so

15  I don't -- I don't know at the time -- I couldn't go

16  over every single note -- whether there was any

17  documentation of a longer amount.

18      Q.   Well, have you ever been provided with the

19  records from Fire Rescue?

20      A.   No.

21      Q.   The -- those records will be in evidence,

22  reflect that he was unresponsive for about four minutes

23  at the scene.

24           Would that -- would that be consistent --

25      A.   Yeah.



PAUL L. GINSBERG, M.D.                                    March 22, 2017
ORE vs TRICAM INDUSTRIES                                              87

 1          Q.   -- with him telling you that he was --
 2          A.   Yeah.
 3          Q.   -- unconscious for a few minutes?
 4          A.   Yes.
 5          Q.   Okay.  And the -- the rescue records also
 6    reflect that on arrival Mr. Ore had a Glasgow Coma Scale
 7    of 11.  What does that mean?
 8          A.   That's a scale that the trauma people use to
 9    estimate how much neurological damage.  It gives them a
10    baseline to -- to follow the person.
11          Q.   Okay.  And a perfect score would be 15?
12          A.   Fifteen, yeah.
13          Q.   All right.  So the -- the records that will be
14    in evidence reflect that rescue noted his Glasgow Coma
15    Scale was 11 on arrival, and by the time they left the
16    scene of the accident, it was 14, and on arrival at the
17    E.R. it was 15, so what would that indicate?
18          A.   That he had a small concussion that got
19    better.
20          Q.   In fact, didn't you -- didn't you say he had a
21    suffered a minor concussion?
22          A.   Yes.
23          Q.   Would that be consistent with someone
24    falling -- falling from a height of 12 feet?
25          A.   Yes.



PAUL L. GINSBERG, M.D.                                    March 22, 2017
ORE vs TRICAM INDUSTRIES                                            88

 1          Q.   By the way, when -- when you first saw him
 2   on -- on 4/25/2012, the -- the -- the most significant
 3   problem he was reporting to you was his right arm.
 4   Correct?
 5          A.   Yes.
 6          Q.   Including his shoulder?
 7          A.   Yes.
 8          Q.   And you specifically noted, based upon your
 9   examination, that you did not believe that any of his
10   complaints of the shoulder had to do with any kind of
11   neurogenic pain.  Correct?
12          A.   That's correct.
13          Q.   And -- and you meant by that, that he
14   didn't -- he wasn't suffering from any kind of an injury
15   to his cervical spine that was causing any neurogenic
16   pain.
17          A.   That's correct.
18          Q.   Right?
19               You didn't believe he sustained any injuries
20   to his discs from the fall from the ladder.  Isn't that
21   true?
22          A.   There were some discs that were described but
23   they don't have -- the disc caused pain -- discs can
24   cause local pain so, yes, it could well be that these
25   discs were from that.



PAUL L. GINSBERG, M.D.                                    March 22, 2017
ORE vs TRICAM INDUSTRIES                                            89

```
 1        Q.   Well --
 2        A.   But -- but I don't think they were causing the
 3   neurological injury as opposed to his local injury or
 4   neuro -- it could cause nociceptive pain as opposed
 5   to --
 6        Q.   But when -- when you noted that he had discs,
 7   you were talking about your review of the reports of
 8   M.R.I.s and the C.T. scans would show that he had
 9   degenerative disc disease.  Correct?
10             MR. COFFEY:  Form of the question.
11             THE WITNESS:  I'm sure I saw something of
12        that.  I'm sure I looked at the Memorial chart.
13        It's got more information than I would be able to
14        get just from talking with him.
15   BY MR. MOWERS:
16        Q.   And those records reflect that he was
17   suffering from degenerative disc disease.  Correct?
18        A.   Yes.
19        Q.   And he had that degenerative disc disease
20   before the day he fell off the ladder, didn't he?
21        A.   Correct.
22        Q.   And that didn't happen overnight, did it?
23        A.   That's correct.
24        Q.   He probably had had it for many years.
25   Correct?
```



1      A.   For a while but not -- I don't know if it's

2    years.

3      Q.   Okay.  So you -- you specifically make a note

4    on that record of the first visit that the -- the arm is

5    the culprit and not the neck.  Isn't that true?

6      A.   Yes, that was always my -- my feeling.  Most

7    of his pain was coming from the arm.

8      Q.   And that's always been your opinion throughout

9    the time you treated him.  Isn't that correct?

10     A.   Yes, that's correct.

11     Q.   Now, you talked about the shoulder and I

12   believe in response to questions from Counsel, you said

13   that on the first visit you learned that he had had an

14   old injury to his A.C. joint in the right shoulder.

15   Isn't that true?

16     A.   That was from the radiologist report.

17     Q.   Okay.  But is that part of your record of your

18   note on 4/25/2012?

19     A.   Yes.  I just mentioned he had an acromion --

20   showed old acromioclavicular joint injury.  The

21   radiologist said grade three which I'm really not sure

22   what that means.

23     Q.   Is that a shoulder separation?

24     A.   I don't know.  Actually -- it -- it -- I --

25   again, I can't tell you exactly.  He just said there was



1  a -- acromioclavicular joint is where the clavicle meets

2  the thing, it's not really where the humerus comes in --

3      Q.    Right.

4      A.    -- so I can't say it means that.

5      Q.    But -- but at least it's clear from your first

6  note that this gentleman was having symptoms relating to

7  his shoulder from this 12-foot fall --

8      A.    Yes, sir.

9      Q.    -- but he also had a history of an old injury

10  to his right shoulder.  Correct?

11     A.    Yes.  That's -- yeah, that was my -- that's my

12  interpretation of what the radiologist said.

13     Q.    Did -- did he ever tell you how he sustained

14  that old injury?

15     A.    No, I didn't ask.

16     Q.    You don't have any record or recollection of

17  him telling you that he had been struck with a crowbar

18  in a fight and that's how he injured his right shoulder?

19          MR. COFFEY:  Form of the question.

20          THE WITNESS:  He may have mentioned it.  I

21      just don't remember it specifically.

22  BY MR. MOWERS:

23     Q.    I'd like you to turn to your note of June 13,

24  2012, Doctor.

25     A.    Yes.



PAUL L. GINSBERG, M.D.                                    March 22, 2017
ORE vs TRICAM INDUSTRIES                                              92

1          Q.   And in that note, you refer to the fact that

2     this gentleman had a mild concussion.   Correct?

3          A.   Yes.

4          Q.   And he -- you understood that he had a

5     shoulder separation that would require surgery?

6          A.   That's correct.

7          Q.   Now, you make a note stating that he had been

8     doing some work on a car.

9               Can you read that entire part of your note.

10         A.   "According to him, he was doing some

11              car audio work in his own house.  He was

12              able to do it for an hour."

13         Q.   And what's the significance of that?

14         A.   What's interesting is he could focus on a task

15    for an hour, because one of his problems was he claimed

16    he was having trouble focusing his mind.

17         Q.   Okay.  So he was doing some kind of work on a

18    stereo on his car?

19         A.   That's what it sounded like.

20         Q.   Okay.  At that point in time, he had not

21    returned to work yet, had he?

22         A.   That's correct.

23         Q.   You had reached the conclusion, certainly by

24    June 13, 2012, that this gentleman didn't require any

25    surgery on his neck.  Isn't that true?



 1      A.   That's correct.  At that time I thought it was
 2   nonsurgical, yes.
 3      Q.   You specifically noted that,
 4           "He has some disc disease, but I do not
 5      believe there's anything surgical going on."
 6   Isn't that in your note?
 7      A.   I believe so, yes.
 8      Q.   And also, you -- you note on that date on
 9   June 13, 2012, that,
10           "Plaintiff has some memory problems that
11      have been minimal, there's -- continuing to
12      improve and should go away completely.
13   Isn't that correct?
14      A.   Yes.
15      Q.   And -- and that would be consistent with you
16   concluding that by January 2013 he no longer was
17   suffering any symptoms from his concussion.  Correct?
18      A.   Right.
19      Q.   Didn't Mr. Ore undergo a -- an evaluation by a
20   neurosurgeon by the name of Alexander Poisik,
21   P-o-i-s-i-k, in June of 2012?
22      A.   I don't know that for sure.  I -- I remember
23   he wanted to see Dr. Pasarin.  He may have seen
24   Dr. Poisik.
25      Q.   Well --



 1              MR. COFFEY:  Form of the question.

 2   BY MR. MOWERS:

 3        Q.   He did see -- isn't it true he saw Dr. Poisik?

 4              MR. COFFEY:  Form of the question.

 5              THE WITNESS:  Vaguely --

 6              MR. COFFEY:  Lack of predicate.

 7              THE WITNESS:  -- remember that.  I vaguely

 8        remember that, yes.

 9   BY MR. MOWERS:

10        Q.   And didn't he tell you that he went and saw a

11   neurosurgeon who told him that he did not require

12   surgery?

13              MR. COFFEY:  Form of the question.

14              THE WITNESS:  Again, I -- I -- I think he did.

15        If he told Dr. Poisik, he probably -- Poisik was

16        very conservative, he would have probably said

17        that.

18   BY MR. MOWERS:

19        Q.   Who -- who would have said that?

20        A.   Dr. Poisik.

21        Q.   Okay.  He's -- he's pretty conservative?

22        A.   Yeah.  He's conservative, yeah.

23        Q.   Do you refer patients to him?

24        A.   I did.  He moved out of the area.

25        Q.   Right.  By the way, as of June 13, 2 -- 2012,



1   you did believe that the plaintiff could return to work.

2   Correct?

3        A.   Yes.

4        Q.   And if you would turn to your note of

5   August 15, 2012.

6        A.   Yes.

7        Q.   In that note, Doctor -- let me back up.

8            As I understand it, when he came to you on

9   that date, he was still complaining of headaches?

10       A.   Yes.

11       Q.   And neck pain?

12       A.   Yes.

13       Q.   And did you go back and review some diagnostic

14   studies to try to figure out why he was having those

15   complaints?  In that -- in that --

16       A.   Yeah, I looked at the C. -- yeah, I went

17   over -- I just reviewed the report of the -- the C.T.

18   and the -- of the brain and the one of the neck.

19       Q.   Okay.  So you -- you -- did you review those

20   with -- with the plaintiff?

21       A.   I don't remember that right now.  I -- I don't

22   remember.  I honestly don't remember whether I showed

23   him this is what it showed, but I know I reviewed it

24   enough to satisfy myself that there wasn't a big

25   problem.



PAUL L. GINSBERG, M.D.                                    March 22, 2017
ORE vs TRICAM INDUSTRIES                                            96

 1          Q.   Were -- was one of the reasons you were
 2    looking at these test results because the plaintiff was
 3    complaining to you of some memory issues?
 4          A.   Right.  I wanted to make sure I didn't miss
 5    anything so I just looked over it.  Yeah.
 6          Q.   Right.  So the C.T. of the brain was negative?
 7          A.   Yes.
 8          Q.   And the C.T. -- and the diagnostic studies of
 9    the cervical spine basically showed that he had
10    degenerative disc disease.  Correct?
11          A.   Yes.
12          Q.   If you would turn to your note of October 10,
13    2012.
14          A.   Yes.
15          Q.   Again, you're making reference to the fact
16    that he had pre-existing cervical degenerative disc
17    disease.  Correct?
18          A.   Yes.
19          Q.   Which could have been aggravated by the fall?
20          A.   Yes.
21          Q.   And you reiterated that he is not a candidate
22    for cervical surgery; he did not require cervical
23    surgery in your opinion.  Correct?
24          A.   Yes.
25          Q.   What does it mean when you reference in your



```
 1   note that "He does not require anesthesiology for

 2   procedures"?

 3        A.   It could be a misprint.  Let me see if I can

 4   translate that.  Where was that -- which -- about where

 5   is it in the note?

 6        Q.   You -- where -- where you state that you do

 7   not believe that he -- his -- he's having radicular

 8   pain.

 9        A.   Oh.  Let me think -- let me see if I can make

10   sense of that.  Oh, I -- I know what it meant.

11   Basically, yeah, the -- the question was whether he

12   needs a lot of pain -- pain management.  That's

13   basically pain management specialist.  That's what I

14   meant.

15        Q.   You didn't believe he required pain

16   management?

17        A.   Well, I -- I didn't think he needed a

18   procedure at this point.  The major procedure they like

19   to do is epidural steroids, as you know, and I didn't

20   think it was a root problem, and -- and at this point he

21   was getting therapy and I would wait to the therapy be

22   performed before a pain management specialist to take

23   over and see him.  That's what this was what I was

24   trying to say.

25        Q.   Okay.
```



 1      A.   It wasn't very eloquent.  It's a little bit
 2  mistyped but --
 3      Q.   But you never -- you never referred him for
 4  pain management, did you?
 5      A.   No.  No.  He did see somebody for pain
 6  management but --
 7      Q.   But you -- you never sent him for pain
 8  management?
 9      A.   No, I don't believe so.
10      Q.   All right.  If you turn to your note for
11  October 24, 2012.
12      A.   Yes.
13      Q.   In that note, you spoke with Mr. Ore about the
14  M.R.I. of his brain that he had on October 18th.
15  Correct?
16      A.   Yes.
17      Q.   And you told him that you -- there was some
18  white matter lesion in the frontal area?
19      A.   Yes.
20      Q.   And that was normal for his age?
21      A.   Yes.  A single lesion like that is usually not
22  very meaningful.  It's -- you know, I usually tell
23  patients that just watch your risk factors for vascular
24  disease.
25      Q.   Right.



PAUL L. GINSBERG, M.D.                                    March 22, 2017
ORE vs TRICAM INDUSTRIES                                              99

1        A.    That's about --

2        Q.    And that -- that -- that finding on that

3    M.R.I. is not related to his fall from the ladder, is

4    it?

5        A.    No.

6        Q.    Now, you testified earlier on direct

7    examination that you referred the plaintiff for an

8    evaluation by a neuropsychologist.

9        A.    Yes.

10       Q.    Isn't that true?

11             And -- and wasn't the plaintiff seen by

12   Dr. Jessica Rivera?

13       A.    I remember that name.  Yes.

14       Q.    Okay.  And you saw the plaintiff again after

15   he was evaluated by Dr. Jessica Rivera.  Isn't that

16   true?

17       A.    I believe so, yes.

18       Q.    Now, isn't it true that Dr. Rivera concluded

19   after doing neuropsychological testing that the

20   plaintiff had no organic brain impairment?

21       A.    That's why I said he did very well.  That

22   means it was -- basically, his organic function was

23   quite good.

24       Q.    Right.  And didn't Dr. Rivera conclude that

25   from a neuropsychological standpoint that the plaintiff



```
 1   could return to work?

 2            MR. COFFEY:  Form of the question.  Predicate.

 3            THE WITNESS:  I don't remember that

 4        specifically.  Whatever she said, I'll -- I'd have

 5        to look at her note again.

 6   BY MR. MOWERS:

 7        Q.   You would defer to her?

 8        A.   Yeah.

 9        Q.   Could you turn your note of December 12, 2012,

10   please.

11        A.   I am on that.

12        Q.   Okay.  And is that the visit where you

13   specifically discussed with the plaintiff the results of

14   the neuropsychological testing?

15        A.   Yes.

16        Q.   Okay.  And if you would return to your note

17   for me, Doctor, of January 9, 2013.

18        A.   January 9.  Yes.

19        Q.   All right.  Under the section Problems,

20   there's reference to concussion with loss of

21   consciousness of 30 minutes.  That's something I asked

22   you about earlier.

23        A.   The -- let's see.  Where does it say that?

24        Q.   If you look in the section of the note --

25        A.   Oh, yeah.  The -- I'm not sure -- it wasn't my
```



PAUL L. GINSBERG, M.D.                                       March 22, 2017
ORE vs TRICAM INDUSTRIES                                              101

 1  current assessment plan that was on there.  That was an

 2  old thing that got on before.

 3       Q.   Right.

 4       A.   We weren't doing them directly -- some of the

 5  coding was being put on by the girls --

 6       Q.   It would repeat itself?

 7       A.   Yeah.  That's just -- that's just old stuff

 8  that got repeated.

 9       Q.   Right, but --

10       A.   The assessment part has -- it was just

11  headaches --

12       Q.   Right.

13       A.   -- and that's what I put down for that.

14       Q.   But clear -- clearly he -- this -- this

15  gentleman was not unconscious for 30 minutes?

16       A.   No, it was less than for 30 minutes, yeah.

17       Q.   It was a few minutes at most?

18       A.   That's no -- no argument.

19            MR. COFFEY:  Form of the question.  He's asked

20       and answered many times.

21  BY MR. MOWERS:

22       Q.   Isn't that true -- isn't that true --

23            MR. COFFEY:  Let me -- let me object.  Don't

24       talk over me.  Okay?  We can both make our record.

25       Asked and answered repeated times.  You already



```
 1        asked the question before.  I object and you got an

 2        answer to it.

 3              MR. MOWERS:  Are you done?

 4              MR. COFFEY:  I am done.

 5   BY MR. MOWERS:

 6        Q.   Counsel asked you some questions earlier about

 7   the shoulder --

 8              MR. COFFEY:  There's knocking at the door.

 9              MR. MOWERS:  Off the record.

10              THE VIDEOGRAPHER:  We're off video record.

11              (Discussion held off the record.)

12              THE VIDEOGRAPHER:  We're back on video record.

13   BY MR. MOWERS:

14        Q.   Counsel asked you some questions about the

15   doctors who performed surgeries on the shoulder, on

16   plaintiff's shoulder.

17              Dr. Berkowitz is one of those doctors.

18   Correct?

19        A.   I don't know if it's Ellowitz or Berkowitz.  I

20   mean, I -- I wrote down Berkowitz.  I know a Berkowitz.

21   I don't know personally Ellowitz.

22        Q.   Okay.

23        A.   I know Berkowitz because he's with a large

24   group from Fort Lauderdale.  I believe some of the guys

25   refer to me.
```



1    Q.   All right.

2    A.   So I assume that's what he meant.  Maybe I

3  mis -- I may have misheard it because it's a name that I

4  heard.

5    Q.   Do you have your March 20th, 2013, note in

6  front of you?

7         MR. COFFEY:  Excuse me.  There's a knock on

8     the door again.

9         MR. MOWERS:  Off the record.

10        THE VIDEOGRAPHER:  We have to go off the

11     record again.

12        THE WITNESS:  Just tell them to get out.

13     Okay.  Sorry.

14        (Discussion held off the record.)

15        THE WITNESS:  Did you say March 20th, 2013?

16     Yes.

17        MR. MOWERS:  Are we still on?  Are we still

18     on?

19        THE WITNESS:  Yes.

20        MR. MOWERS:  Are we still on the record?

21        THE VIDEOGRAPHER:  Yes, we're on the record.

22        MR. MOWERS:  I'm sorry.

23  BY MR. MOWERS:

24    Q.   So did you conduct a neurological evaluation

25  of the plaintiff on March 20th, 2013?



PAUL L. GINSBERG, M.D.                                    March 22, 2017
ORE vs TRICAM INDUSTRIES                                             104

```
 1         A.   It was -- let's see.  I believe I just gave

 2    him the shots and -- and talked to him a little bit, got

 3    some information rather than doing an formal exam, a

 4    physical exam.

 5         Q.   Well, did -- did you note at that time that he

 6    had some weightlifting restrictions?

 7         A.   Yeah.  The -- the -- the orthopedist had given

 8    him that.

 9         Q.   Right.  And didn't you note at that time that

10    there are really no other neurologic restrictions?

11         A.   Yeah.  That's why -- yes, that why I later

12    said he had no neurological --

13         Q.   So as of that date he had absolutely no

14    neurological restrictions.

15         A.   Yes.

16         Q.   Isn't that true?

17         A.   Yes.

18         Q.   He had no cognitive losses?

19         A.   That's correct.  Yeah.

20         Q.   And you -- and you believe at that time that

21    his head -- headache should not really keep him from

22    doing anything.  Correct?

23         A.   That's correct.

24         Q.   If you turn to your note of 8/21/13, please.

25         A.   All right.  8/21.  Let me see where I put that
```



PAUL L. GINSBERG, M.D.                          March 22, 2017
ORE vs TRICAM INDUSTRIES                                  105

 1  one.  Oh, here it is.

 2      Q.    All right.  Counsel asked you some questions

 3  about that note, specifically, with respect to a

 4  impairment rating.  Do you recall that?

 5      A.    Yes.

 6      Q.    Okay.  Now, in your note, you state from a

 7  neurological point of view, the headaches themselves do

 8  not get a rating since they are subjective.  Isn't that

 9  true?

10      A.    That's correct.

11      Q.    What does that mean, that they are subjective?

12      A.    It's hard to measure headaches, how much they

13  are.  It's not -- most headaches, you don't see -- you

14  can't see the pain they have.  You have to get -- just

15  talk to them, see how consistent they are and make an

16  estimate from that, so it is subjective.

17      Q.    Okay.  In other words, you have no objective

18  evidence as to why he's complaining of headaches?

19      A.    Oh, I had the trigger point, let's put it that

20  way.  I do know that.  You can argue that's -- that's

21  cervical.  The question is whether that's cervical,

22  muscular or is it coming from the head, because it

23  radiates from here upwards.  It starts at the cervical

24  occipital junction.  I mean, I thought that was -- the

25  reason I thought that was the cause of his headaches is



```
 1    because every time I gave him a shot he got better which

 2    is incontrovertible.

 3         Q.   But you characterize those complaints as

 4    subjective.  Correct?

 5         A.   The amount of pain he has is subjective.

 6    Right.

 7         Q.   Okay.  Now, the rating that you gave this

 8    gentleman had to do with the two degenerative discs in

 9    his neck.

10            MR. COFFEY:  Form of the question.

11    BY MR. MOWERS:

12         Q.   Isn't that true?

13         A.   That's correct.

14         Q.   Okay.  And you already told -- told us and

15    told the jury that degenerative disc disease predated

16    the date of this fall from the ladder.  Isn't that true?

17            MR. COFFEY:  Form of the question.

18            THE WITNESS:  Falls often exacerbate that so

19        that's why I thought it was --

20    BY MR. MOWERS:

21         Q.   So at -- at best you're talking about an -- an

22    exacerbation?

23         A.   Yes.

24            MR. COFFEY:  Form of the question.

25
```



```
 1   BY MR. MOWERS:
 2        Q.   If you could turn to your note of October 9,
 3   2013.
 4        A.   Yes.
 5        Q.   You -- you could not explain from a
 6   neurological standpoint why this gentleman was still
 7   having headaches.  Isn't that true?
 8        A.   Yes.  Well, I mean, he had the spasm there but
 9   usually he should have -- he should be doing better.  I
10   thought the shots would eventually take hold and give
11   him some sustained relief.
12        Q.   And then if you would turn to your note of
13   December 18, 2013.
14        A.   Yes.
15        Q.   I believe you touched on this on direct
16   examination.  You noted that on that date his blood
17   pres-- his blood pressure had gone up to 177 over 111?
18        A.   Yes.
19        Q.   And did that -- was that related to a specific
20   event in his life?
21        A.   He said some family problems.  I'm not sure
22   what.  Problems with his wife, I think, I suspect, but I
23   don't -- try not to go into the details of that.
24        Q.   Okay.  And you -- you thought it was serious
25   enough that he should go to the emergency room.
```



1        A.    Yes.

2        Q.    Isn't that true?

3        A.    Yes.

4        Q.    And if you turn to your note of January 22nd,

5   2014.

6        A.    Yes.

7        Q.    Did you conduct neurological examination on

8   that date?

9        A.    Yes.

10        Q.    Okay.  And were the neurologic -- were there

11   any positive neurological findings regarding his upper

12   extremity?

13        A.    Upper extremity, no.

14        Q.    By the way, his case manager was with him at

15   that time.  Correct?

16        A.    Yes.

17        Q.    And that -- and that relates to the Workers'

18   Comp?

19        A.    I believe so, yes.

20        Q.    And then if you would turn to your note of --

21   of June 18, 2014, please.

22        A.    June what?

23        Q.    Eighteen, 2014.

24        A.    Let me get back to here.  June 18, I got it.

25        Q.    Okay.  He had a new complaint on that date.



PAUL L. GINSBERG, M.D.                                    March 22, 2017
ORE vs TRICAM INDUSTRIES                                            109

1   Correct?

2        A.   Yes.

3        Q.   You noted that he had paresthesias?

4        A.   Yes.

5        Q.   And that's numbness?

6        A.   Yes, tingling.

7        Q.   Tingling in his face --

8        A.   Yes.

9        Q.   -- on the right side --

10       A.   Episodic.

11       Q.   -- and traveling down his right shoulder to

12  his hand?

13       A.   Yes.

14       Q.   Okay.  That's not related to the fall from the

15  ladder, is it?

16       A.   No.

17       Q.   Now, Counsel asked you some questions about

18  your opinion regarding this man's ability to return to

19  work.

20            As of June 2014, you -- you definitely believe

21  that this man could return to work from a neurologic

22  standpoint.  Isn't that true?

23       A.   Yes.

24            MR. COFFEY:  Form of the question.

25



PAUL L. GINSBERG, M.D.                                    March 22, 2017
ORE vs TRICAM INDUSTRIES                                            110

 1   BY MR. MOWERS:
 2        Q.   And that's what you told Ira Morris.  Correct?
 3        A.   Yes.
 4        Q.   And if you would turn to your note from
 5   December -- I believe it's December the 12th, 2014.
 6        A.   December 17th.
 7        Q.   I'm sorry, December 17th, 2014.
 8        A.   All right.
 9        Q.   It appears that you did an extensive
10   neurologic examination and evaluation of him on that
11   date.  Is that true?
12        A.   Yes.
13        Q.   And that exam was normal, wasn't it?
14        A.   Yeah.  He was depressed but that was about it.
15   You're right, the rest was --
16        Q.   But as far as -- as far as your neurologic
17   examination, it was completely normal?
18        A.   That's correct.
19        Q.   And as of January 2013, I believe you told --
20   told the jury earlier whatever complaints he had that --
21   were from his fall from a concussion standpoint were
22   over.  Isn't that correct?
23        A.   Right, because he demonstrated no neuro -- no
24   cognitive deficits by the neuropsychologist.  There's
25   nothing structural in his head to explain any of the



PAUL L. GINSBERG, M.D.                                    March 22, 2017
ORE vs TRICAM INDUSTRIES                                             111

1   problems so --

2        Q.   Right.

3        A.   -- and the headache is -- was probably a

4   cervicogenic type headache because -- because I gave him

5   shots in that spot, so that's why I -- I think

6   everything that was directly related to the -- to the

7   concussion was gone.

8            MR. MOWERS:   Okay.  Thank you.  I have no

9        further questions.

10           REDIRECT EXAMINATION (PAUL L. GINSBERG, M.D.)

11  BY MR. COFFEY:

12       Q.   Doctor, defense counsel kept on talking about

13  degenerated herniated disc.

14           Do you recall that on the cross-examination?

15       A.   Yes.

16           MR. MOWERS:   Object to form.

17           MR. COFFEY:   What's wrong with the form of the

18       question?

19           MR. MOWERS:   You're mischaracterizing my

20       questions.

21  BY MR. COFFEY:

22       Q.   Okay.  He was talking about degenerated discs.

23  Correct?

24       A.   Yes.

25       Q.   Okay.  Mr. Ore, when you first saw him, was



PAUL L. GINSBERG, M.D.                                    March 22, 2017
ORE vs TRICAM INDUSTRIES                                           112

1   about 45 years of age.  Correct?

2        A.   Yes.

3        Q.   Okay.  At 45 years of age, in the normal

4   patient population, do you expect to see some

5   degeneration in the cervical spine?

6        A.   Yes.

7        Q.   Okay.  Can a fall like this one off a 12-foot

8   ladder onto a concrete deck make a person with

9   degenerative issues in their cervical spine make their

10  cervical spine worse?

11       A.   Yes.

12       Q.   Okay.  Do you read the actual M.R.I. films

13  yourself for the M.R.I.s done in the hospital, back

14  after this accident or do you simply rely upon the

15  reports?

16       A.   I believe -- I'm sorry, I believe I relied on

17  the reports in this case.

18       Q.   Okay.

19       A.   I just don't remember specifically.

20       Q.   Okay.  I'm going to show you the report of

21  April 7, 2012, the M.R.I. of the cervical spine.

22            Does this detail extensive degenerative

23  changes?  Are they talking about herniated discs in this

24  report, Doctor?

25            MR. MOWERS:  Objection, leading, move to



PAUL L. GINSBERG, M.D.                                    March 22, 2017
ORE vs TRICAM INDUSTRIES                                            113

```
 1        strike.
 2   BY MR. COFFEY:
 3        Q.   Doctor, looking at this report of the April 7,
 4   2012, M.R.I., what are they describing --
 5        A.   He says it's a herniated disc --
 6        Q.   -- about C4-5 and C5-6 --
 7        A.   He wrote -- he wrote a posterior herniated
 8   disc essentially to the left.
 9        Q.   Okay.  Does it talk about impressing the
10   spinal cord?
11             MR. MOWERS:  Object to form.
12             THE WITNESS:  He put that down there, yes.
13   BY MR. COFFEY:
14        Q.   Okay.  Does -- tell us what the report says
15   about impression of the spinal cord.
16        A.   It says -- it says impressive -- the sentence
17   is,
18             "There's a mild central stenosis by a
19        herniated disc at C4-5, central to the left and
20        pressing the cord without cord compression or
21        abnormal signal."
22        Q.   Does this report indicate there are things
23   other than degenerative disc disease that you can read
24   from?
25             MR. MOWERS:  Object to the form.
```



PAUL L. GINSBERG, M.D.                                   March 22, 2017
ORE vs TRICAM INDUSTRIES                                              114

```
 1              THE WITNESS:  Degenerative disc disease and
 2         herniated disc are merged together, something like
 3         at different stages, you know.  Often like you'll
 4         get -- after the disc degenerates, usually
 5         herniates out a little bit.  Then you get bone
 6         spurs.  But it can still go out further at that
 7         time and that's why it's still possible to cause
 8         more pain and stuff afterwards.
 9  BY MR. COFFEY:
10      Q.  Over the course of time now to Mr. Ore's life
11  expectancy, would you -- would you believe that his neck
12  is going to get better or worse within a reasonable
13  degree of medical probability --
14              MR. MOWERS:  Objection.
15  BY MR. COFFEY:
16      Q.  -- with respect to the herniated discs at C4-5
17  and C5-6?
18              MR. MOWERS:  Objection, calls for speculation.
19              THE WITNESS:  Generally, it tends -- it
20         doesn't usually get better and frequently, but not
21         inevitably, it gets worse.
22              MR. COFFEY:  Thanks.  I have no further
23         questions.
24              MR. MOWERS:  Just one point of clarification.
25
```



```
 1            RECROSS-EXAMINATION (PAUL L. GINSBERG, M.D.)
 2    BY MR. MOWERS:
 3        Q.    You say the terms herniation, disc herniation,
 4    and degenerative disc disease are -- are used
 5    interchangeably.  Correct?
 6        A.    Well, they're -- they're -- they're related to
 7    problems; in other words, the degenerative disc disease
 8    is the secondary changes you get after the disc
 9    herniates out a little bit --
10        Q.    Right.
11        A.    -- and the -- it often degen -- the disc will
12    start to degenerate at that point, and then the --
13    sometimes more pieces come out, but then you will
14    form -- the body will try to protect it by forming bone
15    spurs around it.
16        Q.    Right.  Right.  And herniations are not always
17    accident related, are they?
18        A.    That's correct.
19            MR. MOWERS:  I have nothing further.
20            MR. COFFEY:  We object to recross-examination.
21    Thank you.  No further questions.
22            Would you like to read or waive, Doctor?
23            THE WITNESS:  I will waive this one, for sure.
24            THE VIDEOGRAPHER:  Okay.  We're off -- we're
25    off video record.  It's 12:19 p.m.
```



PAUL L. GINSBERG, M.D.                                    March 22, 2017
ORE vs TRICAM INDUSTRIES                                            116

```
 1              (The following discussion was held off the
 2    video record.)
 3              THE COURT REPORTER:  Are you ordering?
 4              MR. COFFEY:  I am.
 5              MR. MOWERS:  I will take a regular and a mini
 6       and E Transcript.
 7              (Thereupon, at 12:19  p.m., the deposition was
 8    concluded.)
 9              (Witness excused.)
10              (Reading, subscribing, and notice of filing
11    waived.)
12                        -  -  -  -  -
13
14
15
16
17
18
19
20
21
22
23
24
25
```



```
 1                    C E R T I F I C A T E

 2    THE STATE OF FLORIDA   )
      COUNTY OF BROWARD      )
 3

 4

 5           I, Dona J. Wong, Registered Professional
      Reporter, do hereby certify that I was authorized to and
 6    did stenographically report said deposition in
      stenotype, and that the foregoing deposition as
 7    hereinabove shown is a true and correct computer
      transcription under my shorthand notes of said
 8    deposition.

 9           I further certify that I am not an relative,
      employee, attorney or counsel of any of the parties, nor
10    am I a relative or employee of any attorney or counsel
      or party connected with the action, nor am I financially
11    interested in the action.

12           The foregoing certification of this transcript
      does not apply to any reproduction of the same by any
13    means unless under the direct control and/or direction
      of the certifying reporter.
14
             Dated this 28th day of March 2017.
15

16

17           _____
             Dona J. Wong, RPR, CSR
             My Commission #FF 002053
18           Expires May 16, 2017

19

20

21

22

23

24

25
```



PAUL L. GINSBERG, M.D.                                    March 22, 2017
ORE vs TRICAM INDUSTRIES                                           118

1                    C E R T I F I C A T E

2    THE STATE OF FLORIDA   )
                            )
3    COUNTY OF BROWARD      )

4

5            I, the undersigned authority, certify that

6    PAUL L. GINSBERG, M.D. personally appeared before me and

7    was duly sworn on the 22nd day of March 2017.

8            WITNESS my hand and official seal this 28th

9    day of March 2017.

10   _____

11   Dona J. Wong, RPR, CSR
     Notary Public State of Florida
12   My Commission # FF002053
     Expires May 16, 2017

13

14

15

16

17

18

19

20

21

22

23

24

25

